IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| LAUREN SEARLS,<br><br>      Plaintiff,<br><br>      v.<br><br>JOHNS HOPKINS HOSPITAL,<br><br>      Defendant. | Case No. 1:14-cv-02983-CCB |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION
TO STRIKE DEFENDANT'S EXPERT DESIGNATIONS OF
MARIA CVACH, CLYDE C. RICHARD, AND GARRY BROCK,
<u>AND TO PRECLUDE THEIR TESTIMONY</u>**

Plaintiff Lauren Searls, by undersigned counsel, submits this memorandum in support of her motion to strike the expert designations and reports of Maria Cvach, Clyde C. Richard, and Garry Brock and to exclude any testimony based on these reports.

## FACTS

Ms. Searls has brought suit against Defendant Johns Hopkins Hospital ("JHH") for violating Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12111-12117, by denying her request for an American Sign Language ("ASL") interpreter as a reasonable accommodation and consequently rescinding her job offer. Ms. Searls is a 2012 graduate of the Johns Hopkins School of Nursing who is deaf. During nursing school, she successfully completed two clinical rotations in the Halsted 8 unit of JHH. In July 2012, following her graduation, Ms. Searls applied to work as an entry-level nurse on the Halsted 8. JHH quickly offered Ms. Searls the job, contingent upon her passing her employee health screening. Ms. Searls then requested an ASL interpreter as a

reasonable accommodation that would enable her to perform the essential functions of the job safely and effectively. JHH denied the request and rescinded Ms. Searls' job offer.

JHH has designated Clyde C. Richard, Garry Brock, and Maria Cvach as expert witnesses in this case. *See* Ex. 1, Def.'s Initial Expert Disclosures.

## I.     Clyde C. Richard and Garry Brock

Dr. Richard, a mechanical engineer, and Dr. Brock, a biomechanical engineer, both work for CED Technologies, Inc., a forensic engineering company that primarily investigates and reconstructs various types of accidents. Ex. 2, CV of Clyde C. Richard; Ex. 3, CV of Garry Brock; Ex. 4, Dep. of Clyde C. Richard 6:7-15. JHH asked CED Technologies "to examine from a human factors/biomechanical engineering perspective some of the issues that would make it impossible and or very difficult for a nurse with severe hearing problems to function on a particular floor of the JHH." Ex. 5, Expert Report of Dr. Richard and Dr. Brock at 1. CED Technologies assigned Dr. Richard to the case and Dr. Richard was assisted by Dr. Brock, a newer CED Technologies employee. *Id.* at 2; Ex. 4, Richard Dep. 32:1-8.

Neither Dr. Richard nor Dr. Brock is a physician or a nurse. Ex. 4, Richard Dep. 21:11-21, 33:2-10. Dr. Richard has never supervised any physicians or nurses or been responsible for patient care. *Id.* 22:1-8. Although Dr. Brock had previously performed some research related to bones in a hospital, Dr. Richard was unsure of whether Dr. Brock had ever supervised medical personnel. *Id.* 33:10-20. Nevertheless, Dr. Richard testified that he was not relying on any expertise Dr. Brock may have developed in the provision of health care or supervision of medical personnel. *Id.* 33:21-34:5. Neither Dr. Richard nor Dr. Brock is deaf or knowledgeable in sign language. *Id.* 23:7-8, 24:9-16, 34:6-9. Dr. Richard has never before been named as an expert in a case involving a deaf individual, nor has he done any research on the employment of deaf

2

individuals.  *Id.* 25:8-14.  Indeed, Dr. Richard has never before worked with a deaf person.  *Id.* 25:15-18.  Dr. Richard admitted that none of his publications relate to health care institutions or deafness.  *Id.* 25:19-26:6.  Similarly, none of the publications listed in Dr. Brock's CV appear to relate to health care institutions or deafness either.  Ex. 3, CV of Garry Brock.

The only area of expertise relevant to this case that Dr. Richard and Dr. Brock believe they possess is in "human factors," which Dr. Richard defined as "designing products that are human friendly."  Ex. 4, Richard Dep. 14:4-12.  Although Dr. Richard has served as an expert in cases involving health care products, such as wheelchairs and hospital beds, all of these cases were brought by injured consumers or patients claiming negligence or products liability.  *Id.* 18:1-21:4.  Dr. Richard has never served as an expert in a case evaluating whether a health care practitioner could perform her job.  *Id.* 21:5-10.

To prepare their report, Dr. Richard and Dr. Brock visited Halsted 8 and, because Halsted 8 was under renovation at the time, they also visited the Halsted 4 unit at JHH, which was a replica of the Halsted 8 unit pre-renovation.  Ex. 5, Expert Report of Dr. Richard and Dr. Brock at 2.  To learn about the various equipment they viewed on their tour, Dr. Richard and Dr. Brock spoke with Maria Cvach, JHH's Assistant Director of Nursing (and one of JHH's proposed experts in this case), and consulted the equipment's operating manuals.  *Id.* at 6.

Dr. Richard and Dr. Brock's primary opinion is that without a skilled interpreter with her at all times, Ms. Searls would have been an ineffective nurse because of her inability to hear audible alarms.  *Id.* at 10-11.  Although the report states that "JHH's evaluation showed that even with the full-time interpreter, Ms. Searls would have limitations that may have serious results in a hospital setting," Dr. Richard testified that this was not his opinion, acknowledging that he was "just a hardware guy here."  *Id.* at 1; Ex. 4, Richard Dep. 40:17-41:7.  Nevertheless, Dr. Richard

3

noted that he suspected Ms. Searls would have limitations working with an interpreter, but conceded that he had not evaluated that question, nor was he qualified to express such an opinion. Ex. 4, Richard Dep. 41:11-42:4, 71:1-15.

When asked specific questions about how the equipment on Halsted 8 operated, Dr. Richard expressed uncertainty. For example, in response to a question about whether the code machine allowed individuals to speak through it or whether it instead only had a buzzer, Dr. Richard responded, "I think it's both. I can see a, a speaking port but I think it's both." *Id.* 42:13-43:4. He also was not certain as to the location of the other end of the code machine, where the voice or buzzer could be heard. *Id.* 43:9-18. Nor did he know whether the bathroom cord's visual cue was outside of the patient's room, in the nurses' station, or in both locations. *Id.* 44:11-45:2.

Dr. Richard was also unfamiliar with the various tasks nurses perform on units like Halsted 8. *Id.* 67:9-16 (testifying that during his visit, the nurses "were moving around everywhere," and that he did not know what they were doing). Although he opined that a nurse "can't be doing two things at the same time," and thus could not simultaneously watch an alarm monitor from the nurses' station and work in a patient's room, he acknowledged that this opinion did not require any level of expertise to reach and that an ordinary jury could make the same determination. *Id.* 68:8-21.

**II.   Maria Cvach**

Ms. Cvach is JHH's Assistant Director of Nursing, with a focus on clinical standards. Ex. 6, CV of Maria Cvach at 1; Ex. 7, Dep. of Maria Cvach 6:5-10. She is in charge of the policies and procedures for nursing at JHH and has worked on developing a new system of alarm management at the hospital. Ex. 7, Cvach Dep. 7:14-21. Ms. Cvach testified that she is involved

with standards for patient care, not standards of practice that relate to nurses' qualifications to perform their jobs. *Id.* 9:19-12:3.

Ms. Cvach has never worked with or supervised a deaf nurse or physician. *Id.* 39:12-16, 42:4-6. She does not know sign language. *Id.* 41:16-17. Until this case, she had never before been offered as an expert in any litigation involving the ability of a deaf individual to work as a nurse. *Id.* 42:7-12. Ms. Cvach admitted that she has no knowledge of how deaf nurses deliver patient care or how deaf health care providers work with sign language interpreters. *Id.* 47:9-20. Nevertheless, JHH asked her to evaluate in this case whether a deaf nurse could monitor and respond to alarms on the unit. *Id.* 42:16-43:2. In taking on this assignment, Ms. Cvach never independently researched deaf nurses or whether there are deaf nurses working in the health care field in the United States, nor did she talk with any sign language interpreters who work with deaf professionals. *Id.* 47:5-8, 47:21-48:3, 54:18-55:2. She never observed Ms. Searls working at her current hospital with an interpreter. *Id.* 71:11-18. She conceded that she knew nothing about the speed with which ASL can be communicated. *Id.* 48:4-7.

Ms. Cvach has opined that "it would have been very difficult for Ms. Searls even with a sign language interpreter to perform functions related to telemetry monitoring," because, given the high quantity of alarms sounding in the unit at that time, it was difficult to distinguish between the alarms that required action and those that were merely background noise. *Id.* 53:11-54:2; Ex. 8 Expert Report of Maria Cvach at 4. When asked what in her "background, education and training or research for this case" allowed her "to form an opinion to a reasonable degree of probability about what a deaf nurse is capable of doing," Ms. Cvach responded:

> I don't have direct experience with a deaf nurse, all I have is experience with the amount of alarms that were occurring and the lack of equipment and the legacy equipment that was available in the unit that would I think have been difficult for a hearing nurse let alone a hearing impaired or a deaf nurse.

5

Ex. 7, Cvach Dep. 54:6-17.  She explained that she "did not see it as [her] role to look at deaf nurses and what they're capable of doing."  *Id.* 55:15-17.

Ms. Cvach admitted that she was not aware of any serious injuries or deaths occurring as a result of a deaf nurse missing an alarm.  *Id.* 56:3-18.  And although she has data about hearing nurses missing alarms, she has no data about a sign language interpreter's ability to hear and communicate alarms to deaf health care professionals.  *Id.* 57:15-58:11.  Nevertheless, Ms. Cvach opined that: "A deaf nurse would not be able to respond quickly to these alarms.  The time it would take to have someone interpret for the deaf nurse could result in a delayed patient response and potential patient injury."  Ex. 8, Expert Report of Maria Cvach at 4.  Ms. Cvach admitted, however, that she did not know how long it would take for an interpreter to communicate that there was an alarm sounding in a particular room.  Ex. 7, Cvach Dep. 60:20-62:21.  She conceded that she could not state to a reasonable degree of probability that having a deaf nurse work with a qualified sign language interpreter would result in more patient injuries.  *Id.* 63:17-64:12.

Ms. Cvach further opined that "a delay in the nurse hearing an overhead page or directions during a code situation could have resulted in a delayed response with a potential for patient harm."  Ex. 8, Expert Report of Maria Cvach at 4.  She testified that she "personally feel[s] that it would be very difficult" for a deaf nurse with an interpreter to function in a code situation, but then agreed that if the deaf nurse knew what her role was during the code, "then I think that it could be done."  Ex. 7, Cvach Dep. 65:2-68:6.  Ms. Cvach also acknowledged that she had no evidence to suggest that a deaf nurse working with an interpreter would result in patient harm during a code.  *Id.* 68:19-69:10.

6

## ARGUMENT

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Before admitting expert testimony, "the trial judge must act as a gatekeeper, conducting a preliminary assessment of whether the expert's proffered testimony is both relevant and reliable." *United States v. Graham*, -- F.3d--, No. 12-4659, 2015 WL 4637931, at *23 (4th Cir. Aug. 5, 2015) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). This "gatekeeping responsibility" applies not only to "scientific" testimony, but to all expert testimony. *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp.2d 378, 391 (D. Md. 2001) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

The contested issues in this case are whether Ms. Searls could have performed the nursing job on Halsted 8 safely and effectively with the assistance of an ASL interpreter and whether providing an ASL interpreter would have posed an undue hardship on JHH. Dr. Richard, Dr. Brock, and Ms. Cvach are not qualified to offer a reliable opinion that is relevant to either issue or helpful to the trier of fact. Their opinions, therefore, should be excluded.

Presumably, JHH is offering these experts on the issue of whether Ms. Searls could have safely and effectively performed the essential job functions of a Halsted 8 nurse. Opining on this question requires expertise in the professional practice of deaf medical professionals. Yet because none of the proposed experts has any knowledge of or experience working with,

7

supervising, or studying deaf medical professionals, they are all unqualified to render opinions about how Ms. Searls, a deaf nurse, would have performed her job. *See* Ex. 4, Richard Dep. 21:11-21, 22:1-8, 25:8-18, 33:2-10; Ex. 7, Cvach Dep. 39:12-16, 42:4-6, 47:5-48:3, 54:18-55:2; *Kumho Tire*, 526 U.S. at 150 (noting that concerns with reliability of experts may arise when they lack "personal knowledge or experience"). Dr. Richard is not even familiar with the way that hearing nurses do their jobs and, although he was unsure of whether Dr. Brock had this knowledge, he testified that he did not rely on any expertise Dr. Brock may have in the provision of health care in forming his opinions. Ex. 4, Richard Dep. 21:1-21, 33:2-34:5. Furthermore, none of the proposed experts knows sign language. *Id.* 23:7-8, 24:9-16, 34:6-9; Ex. 7, Cvach Dep. 41:16-17.

Although Dr. Richard and Dr. Brock may be experts in their respective fields of mechanical and biomechanical engineering and Ms. Cvach may be an expert on hospital alarm systems, "[t]he fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas." *Shreve*, 166 F. Supp. 2d at 391; *see Kumho Tire*, 526 U.S. at 150 ("[T]here are many different kinds of experts, and many different kinds of expertise."); *Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984) (Whether an expert's qualifications are sufficient depends on "the nature of the opinion he offers."). Instead, an expert "must possess some special skill, knowledge or experience concerning the particular issue before the court." *Shreve*, 166 F. Supp. 2d. at 392 (internal quotation marks and citation omitted). In *Shreve*, for example, although the proposed expert had great expertise in mechanical engineering generally, he lacked the professional experience related to the design, manufacture, operation, or safety of outdoor power equipment necessary to offer an expert opinion in a case involving a snow thrower. *Id.* at 393. Here, none of JHH's proposed experts

has the specific expertise required in this case to render an opinion about how a deaf nurse would have performed her job with the aid of an interpreter.

Dr. Richard and Dr. Brock are not even qualified to offer opinions about the functionality of the alarm system used in Halsted 8 in 2012.  Their knowledge in this case was gleaned entirely from product manuals and second-hand information from Ms. Cvach.  Ex. 5, Expert Report of Dr. Richard and Dr. Brock at 6.  As such, it is not surprising that Dr. Richard was unable to provide definitive answers at his deposition as to how the alarm system equipment worked.  Ex. 4, Richard Dep. 42:13-45:2.

Furthermore, because they have no relevant expertise, Dr. Richard, Dr. Brock, and Ms. Cvach are not able to offer opinions that are reliable.  "A reliable expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods."  *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (emphasis in original).  The opinions of JHH's experts are formed entirely on the basis of belief and speculation, rather than on actual knowledge.

Ms. Cvach believes that it would be difficult for a deaf nurse with an interpreter to monitor and respond to alarms, but does not base this belief on any experience working with or observing a deaf nurse.  Ex. 7, Cvach Dep. 54:6-17.  Indeed, she testified that she "did not see it as [her] role to look at deaf nurses and what they're capable of doing." *Id.* 55:15-17.  When asked the basis of her belief that a deaf nurse would also have trouble operating in a code situation, Ms. Cvach responded:  "I personally feel that it would be very difficult." *Id.* 65:2-13.  Ms. Cvach further opined that a deaf nurse working with an interpreter could delay responding to patients and thus endanger patient health, but admitted that she did not know how long it would take for an interpreter to communicate the sounding of an alarm from a patient's room.  *Id.*

9

60:20-62:21. Dr. Richard "would suspect" that Ms. Searls would have limitations working with an interpreter, but acknowledged that this suspicion was not based on any evaluation or research he had performed. Ex. 4, Richard Dep. 41:11-42:4. Such speculation and belief do not form the bases of reliable expert opinions.

Although Ms. Cvach is quite knowledgeable about JHH's alarm system, because there is no dispute that Ms. Searls would have had to respond to auditory alarms on Halsted 8, the opinions Ms. Cvach is qualified to offer about the alarm system generally would not be helpful to the trier of fact here. Furthermore, Stacey Rotman, the nurse manager of Halsted 8 in 2012, testified in great detail in her deposition about the alarm system in place on Halsted 8 and could do so again at trial if needed. *See* Ex. 9, Dep. of Stacey Rotman 21:16-24:19, 43:14-60:8. No expert testimony on this issue is necessary, particularly given that it is not in dispute.

For the same reason, even if Dr. Richard and Dr. Brock were qualified to offer opinions in this case, their central opinion, that Ms. Searls could not monitor and respond to alarms without an interpreter, is not a disputed point and, therefore, not helpful. *See* Ex. 5, Expert Report of Dr. Richard and Dr. Brock at 10-11. Ms. Searls has brought suit against JHH precisely because it denied her request for a full-time interpreter. On the point that is relevant and disputed – that Ms. Searls could monitor and respond to alarms with an interpreter – Dr. Richard and Dr. Brock have rightly acknowledged that they are not qualified to express an opinion. Ex. 4, Richard Dep. 71:1-15.

Finally, "[t]he helpfulness requirement of Rule 702 . . . prohibits the use of expert testimony related to matters which are obviously . . . within the common knowledge of jurors." *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013) (internal quotation marks omitted). Dr. Richard and Dr. Brock's conclusion that Ms. Searls could not perform the job without a full-

time interpreter is based on the idea that a nurse "can't be doing two things at the same time," and thus could not simultaneously watch a visual alarm monitor from the nurses' station and work in a patient's room. Ex. 4, Richard Dep. 68:8-17. As Dr. Richard acknowledged, however, any juror could determine for herself that a nurse cannot be in two places at once. *Id.* 68:18-69:10. Therefore, Dr. Richard and Dr. Brock's opinion would not be of assistance to a jury in this case.

## CONCLUSION

For the foregoing reasons, this Court should grant Ms. Searls' motion and strike the expert designations and reports of Maria M. Cvach, Clyde C. Richard, and Garry Brock.

>Respectfully submitted,
>
>  /s/
>Joseph B. Espo, Fed. Bar No. 07490
>Jessica P. Weber, Fed. Bar No. 17893
>BROWN, GOLDSTEIN & LEVY, LLP
>120 E. Baltimore Street, Suite 1700
>Baltimore, Maryland 21202
>T:  (410) 962-1030
>F:  (410) 385-0869
>jbe@browngold.com
>jweber@browngold.com
>
>H. Larry Vozzo
>Michael Schwartz
>LAW OFFICES OF H. LARRY VOZZO
>AXA Tower I, Suite 1710
>100 Madison Street
>Syracuse, New York 13202
>T: (315) 476-2191
>F: (315) 449-9804
>hlvesq@yahoo.com
>michaelschwartz53@gmail.com
>
>*Attorneys for Plaintiff*

Dated:  August 31, 2015