EXHIBIT 6

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
2                   (Northern Division)

3   LAUREN SEARLS                    *
                                     *
4            Plaintiff               *
                                     *        Case No.:
5        v.                          *
                                     *        1:14-CV-02983-CCB
6   JOHNS HOPKINS HOSPITAL           *
                                     *
7            Defendant               *
                          * * * * * * * * *
8

9

10          The videotape deposition of CLYDE C.

11   RICHARD, Ph.D., P.E., taken on Thursday, June 18th,

12   2015, commencing at 9:59 a.m., at the law offices

13   of Brown, Goldstein & Levy, LLP, 120 East Baltimore

14   Street, Suite 1700, Baltimore, Maryland 21202,

15   before Sharon A. Beaty, Notary Public.

16

17

18

19

20

21   Reported by:  Sharon A. Beaty, CSR

1    finish my questions before you begin answering.

2    And the last is that if you need a break at any

3    time, just let us know, okay?

4        A    Okay.

5        Q    Where are you employed?

6        A    CED Technologies, Inc.

7        Q    And what is CED Technologies, Inc.?

8        A    CED Technologies, Inc. is a forensic

9    engineering company located headquarters in

10   Annapolis with offices in other places.

11       Q    And what do you mean by forensic

12   engineering?

13       A    We investigate primarily, investigate

14   and reconstruct accidents of various types,

15   everything but airplane crashes.

16       Q    How many professionals does CED employ?

17       A    About 40.

18       Q    How much of your work -- well, strike

19   that.

20            Is, is the firm, is the firm's work

21   entirely litigation support?

1        A    It's actually a very fun thing to teach,

2    it's getting engineers to price out with interest

3    and inflation and payments a, a project.

4        Q    And you list on your CV your areas of

5    expertise.

6        A    Yes.

7        Q    Which, if any, do you regard as relevant

8    to this case?

9        A    Human factors.

10        Q    Okay.  And what, what is human factors?

11        A    Human factors is designing products that

12    are user friendly, and one of the best examples I

13    can maybe give is the car.  Back in the '70s you

14    bought a car and the front seat went forward and

15    backward and that was all, and if you were short

16    you sat on a pillow.  Today a car seat goes forward

17    and backward, up and down, tips, is heated, is

18    cooled, and the steering wheel adjusts too, so we

19    have made that compartment user friendly, so we're

20    designing products not forcing a person to learn

21    how to use them or be comfortable with them, we're

1    Q    Have you ever done any contracting work

2    for a health care institution, that is hospital,

3    nursing home, that type of entity?

4    A    I've done some products, some health

5    products, but I can't think specifically of an

6    institution that I've worked for.

7    Q    What health products have you worked on?

8    A    I do Hoyer lift cases, I do wheelchair

9    cases and I've done some other health products.

10    Q    When you say Hoyer lift, what is that?

11    A    Hoyer lift is a bed lift, it's -- you

12    bring it up to a bed and you harness a person and

13    pull them up out of the bed and set them in a

14    wheelchair.  I've done five or six of those.

15    Q    And those are either negligence or

16    products liability cases in which the allegation is

17    that a patient was injured because of some

18    negligent act or defect in the lift?

19    A    Yeah, the wheel fell off the lift or the

20    harness broke or the patient wasn't put in right

21    and fell out of the lift, sure, that kind of case.

1     Q    And you said you also have done some

2    wheelchair cases.  What, what are those?

3         A    I do a fair amount of cases for a

4    company called EZ Lock.  They make a lockdown

5    system for handicapped vans that the chair locks

6    into.

7         Q    And I take it those cases are

8    circumstances in which the wheelchair user is

9    injured in an accident and there's some claim that

10   there was some defect in the lock?

11        A    Yes, they're claiming the lock released

12   prematurely and the guy drove the car into a

13   barrier or he came loose as a passenger, sure.

14        Q    Other than those have you done any work

15   for health care institutions?

16        A    Yeah, I think of one now, I did a

17   hospital bed case in Florida, a guy climbing over

18   the side of a hospital bed in Panama City.

19        Q    And what was the nature of that claim as

20   it related to your work?

21        A    The claim was that the bed railing was

1  loose, it was -- a bolt was missing in the bed

2  railing and that allowed him to get over the bed

3  railing.

4       Q    And you, you did a, I noticed you did a

5  case here I think involving a, some sort of lamp.

6       A    A lamp?

7       Q    With a surgeon.  Give me a moment.  I

8  think it was you.  Mary Clark versus Eric Chang.

9       A    Oh, the Chang case, that's doctors,

10 yeah, I did that, and another thing coming back to

11 memory, I did a case for GE where their, their big

12 lights in the operating room fell off the track and

13 landed on a patient during surgery.  GE was my

14 client.  I did a case, I remember crawling around a

15 floor in a hospital where they told me not to upset

16 the patient, I think I was looking at the

17 slipperiness of the floor.  Somebody claimed they

18 slipped on the floor.  That was in a hospital.

19      Q    And the Chang case was specifically

20 whether the, a physician would know that the lamp

21 was too hot?

1    A    Yeah, he, he had a practice of setting,

2    setting on the patient a cauterization device and

3    for some reason this thing malfunctioned and burned

4    the patient.

5    Q    Okay.  So none of those cases that

6    you've just talked about involving doctors and

7    health care institutions had to do with evaluating

8    whether a health care practitioner could perform

9    his or her job?

10    A    True.

11    Q    Have you ever -- well, let me -- I take

12    it you're not a doctor?

13    A    I'm a doctor, but not that kind of

14    doctor.

15    Q    Not a medical doctor?

16    A    True.

17    Q    And not an osteopath?

18    A    True.

19    Q    Just to rule that out.  And you're not a

20    nurse?

21    A    True.

Deposition of Clyde RIchard                                    Searls v Johns Hopkins Hopsital

1          Q    And you've never supervised medical

2    doctors?

3          A    True.

4          Q    And you've never supervised nurses?

5          A    Also true.

6          Q    And you've never been responsible for

7    patient care?

8          A    True.

9          Q    How do you know in this case

10   specifically what Ms. Searls would have been doing

11   had she been hired by Johns Hopkins University?

12         A    I was allowed to go on Halsted 8 and

13   look at a mirror image of Halsted 8, which was

14   Halsted 4, and Halsted 4 was a functioning

15   operation, and observe at that time what the nurses

16   were doing and what the nurses' station consisted

17   of and what the room consisted of.

18         Q    How long were you there?

19         A    Probably an hour, hour and a half maybe,

20   between the two floors.

21         Q    Okay.  And at the time you went to

1    Halsted 8 it was not in use any longer, correct?

2         A    No, it was -- it was still there, the

3    walls were still up, the rooms, you could, you

4    could figure out the rooms, you could figure out

5    the nurses' station, the flow of things, but it was

6    being renovated.

7         Q    Do you know American Sign Language?

8         A    No, I don't.

9         Q    Have you ever worked with anyone who

10   uses American Sign Language as his or her primary

11   mode of communication?

12        A    Many years ago, but I was not signing,

13   they were, they were signing, within the group they

14   were signing.

15        Q    Did you have an interpreter?

16        A    No.

17        Q    How did you know what the person was

18   signing?

19        A    We were drawing, we were drawing

20   sketches on the wall actually.  The guy, I had a

21   house built one time and the carpenter was deaf and

1    he and I communicated via sketches on the wall.

2        Q    Did that work out okay?

3        A    Yeah.

4        Q    The house came out looking the way you

5    wanted it?

6        A    Pretty much.

7        Q    In terms of what the carpenter did?

8        A    Yeah.

9        Q    Did you do any research in, in respect

10   to this case about how American Sign Language is

11   used in communications?

12       A    No, nothing specific.

13       Q    Have you done any research in any other

14   case about how American Sign Language is used in

15   communications?

16       A    No.

17       Q    Do you know anything about deaf

18   education?

19       A    Only what I have been able to read.

20   I've done a little looking on the Internet but

21   nothing very specific.

1        Q     What did you learn in, in your looking

2    on the Internet?

3        A     Well, I certainly know about the famous

4    school in Washington that is, that is deaf,

5    Gallaudet I guess, and I have observed over my

6    life, I've observed deaf people communicating with

7    each other and with speaking people.

8        Q     Until this case have you ever been

9    offered as an expert in any matter involving a deaf

10   individual?

11       A     No.

12       Q     Have you ever done any research on

13   employment of deaf individuals in any regard?

14       A     No.

15       Q     And again, I'm sorry, I may have asked

16   you this, but you never, you never worked, you've

17   never worked with a deaf person?

18       A     No, not in any, any capacity.

19       Q     I saw in your notebook a list of

20   publications that you have authored over the years.

21       A     Yes.

1      Q     Are any of them related to health care

2   institutions?

3      A     No.

4      Q     Are any of them related in any fashion

5   to deafness?

6      A     No.

7      Q     So none of them, and I don't remember

8   all of them, I remember looking and seeing

9   something about nuclear power plants.

10     A     The early ones, yes.

11     Q     Does any of them relate in --

12  specifically to this case?

13     A     No.

14     Q     What did you review in connection with

15  your work in this case?

16     A     Reviewed expert reports by people other

17  than us, University of Rochester people, reviewed

18  those quickly, and that was really all other than

19  reviewing the literature I brought here, which I

20  think there's five specific pieces of equipment

21  that we were told would be on Halsted 8 and would

1          Q     Give me a moment to find my copy.  First

2    of all, I note on the cover that you were assisted

3    by someone named Jerry Brock.

4          A     Yeah, Garry.  Yeah, Garry Brock.  He's

5    a --

6          Q     Garry, I'm sorry.

7          A     -- fairly new employee to CED.  He's a

8    Ph.D. from Cornell in biomechanical engineering.

9          Q     And what did Mr. Brock do in connection

10   with your report?

11         A     He visited the hospital with me the same

12   day I visited the hospital and he researched

13   actually the documents that are sitting here, 1

14   through 5, references of various pieces of hardware

15   that would be used on Halsted 8.

16         Q     Okay.  So you sort of indicated a stack

17   of paper, those are the operating manuals for

18   various pieces of equipment?

19         A     Yes, we referenced I think on page,

20   starting on page 7 we reference respiratory

21   equipment, infusion pump, Kangaroo pump.  These are

1    the manuals for that hardware.

2           Q    Okay.  Has, to your knowledge has

3    Dr. Brock -- first of all so we're clear, he is a

4    Ph.D., correct?

5           A    Yes.

6           Q    He's not a medical doctor?

7           A    True.

8           Q    And to your knowledge has he ever been a

9    nurse?

10          A    No.  He has spent a lot of time at

11   hospitals though because part of his program was in

12   New York City I believe at Columbia Presbyterian or

13   something like that.

14          Q    And what did he do at that institution?

15          A    I think he's a bone guy, I think his

16   Ph.D. had something to do with bone, bone growth or

17   gluing bones back together or something like that.

18          Q    Do you know if he supervised any medical

19   personnel at Columbia Presbyterian?

20          A    I don't know either way, I don't.

21          Q    Are you relying on any expertise he has

1    in the supervision of medical personnel?

2        A    No.

3        Q    Are you relying on any expertise he may

4    have developed in the provision of health care?

5        A    No.

6        Q    Does he sign?

7        A    No.  I don't think so.

8        Q    Okay.  Is he deaf?

9        A    No.

10       Q    Start there.

11       A    No.

12       Q    Okay.  Is it your understanding that

13   Ms. Searls is deaf?

14       A    Yes.

15       Q    Who told you that?

16       A    I probably read that in the complaint.

17   At least she's audio limited.  I don't know if

18   she's a hundred percent total or just restricted.

19       Q    Okay.  Did any of the folks at Hopkins

20   with whom you spoke ever express any doubt about

21   Ms. Searls being deaf?

1    any of that.

2          Q    Okay.  The next sentence says that JHH's

3    evaluation showed that even with a full-time

4    interpreter Ms. Searls would have limitations that

5    may have serious results in a hospital setting.

6    What is that statement based on?

7          A    That was based on our review of the

8    technical stuff in this case, that, that the, with

9    her audio difficulties the hundred percent signer

10   would have to know some of the stuff in these

11   books.

12         Q    Okay.  That's not what that sentence

13   says though.

14         A    Well, essentially it says that.  I mean

15   she would have certain limitations in a hospital

16   setting.

17         Q    No, sir, it says JHH's evaluation showed

18   that even with the full-time interpreter Ms. Searls

19   would have limitations.  What interpret -- what

20   evaluation by Johns Hopkins Hospital were you given

21   or told that demonstrated that even with an

1    interpreter Ms. Searls would have limitations that

2    may have serious results in a hospital setting?

3         A    I think I would have picked that up in

4    Maria's report, that was the Hopkins input.

5         Q    So that's not your opinion?

6         A    No, not really, no.  I'm just a hardware

7    guy here.

8         Q    That's, that's fine.  I just want to

9    make sure.

10        A    Okay.

11        Q    So you won't be offering an opinion as

12   to whether with an interpreter, with a full-time

13   interpreter Ms. Searls would have limitations that

14   may have serious results in a hospital setting?

15        A    Looking at the hardware I would suspect

16   that but I won't say specifically I've evaluated

17   that aspect.

18        Q    Okay.  Do you have any qualifications

19   that would allow you to determine to a reasonable

20   degree of probability as to whether Ms. Searls

21   working with a dedicated interpreter would have

1   limitations that would have serious results in a

2   hospital setting?

3          A    No, I haven't done research in that

4   area, I really haven't.

5          Q    Okay.  So you won't be offering -- the

6   sentence is in your report but you won't be

7   offering that opinion at trial?

8          A    True.

9          Q    On page 3 of the report you refer, sort

10  of down four lines from the bottom of the text,

11  it's above the picture -- it's this page, Doctor.

12         A    Yeah, I got it.

13         Q    Okay.  What is the, what you describe as

14  a code machine?

15         A    It's in the room, it's a small unit in

16  the room, nurses use it to call for assistance.

17  It's usually at the head of the bed I believe in a

18  patient room.  It's a nurse-to-nurse audio system.

19         Q    Okay.  And is it a nurse-to-nurse audio

20  system that requires -- well, strike that.

21              Is it a, a system through which

1    individuals can speak or is it only a buzzer or

2    something?

3        A    I think it's both.  I can see a, a

4    speaking port but I think it's both.

5        Q    And is it your understanding that the

6    code machine is something that a nurse in the room

7    would use to summon assistance from others?

8        A    Yes.

9        Q    Where is the other end of the code

10   machine, that is, you know, where is the buzzer or

11   voice heard?

12       A    I can't tell you specifically but I

13   think it's in the nursing station down at the, in

14   this case I think the nursing station was in the

15   middle of the hall.

16       Q    But you're not certain?

17       A    No, I didn't push the button to see who

18   came running.

19       Q    And you didn't have Dr. Brock hang out

20   at the nursing station and then push the button to

21   see whether he could hear it?

1    A    No, I didn't.

2    Q    And you didn't do that in Halsted 4

3  either, the mirror image?

4    A    True.

5    Q    Okay.  And Halsted 4 was still in use as

6  a, there were patients on it?

7    A    Oh, it was hustling and bustling when I

8  was there.

9    Q    Hopkins is a busy place.

10    A    I was amazed how big it is.

11    Q    It says the second device was a pull

12  cord located within the in-room lavatory, on that

13  same page.

14    A    Yes.

15    Q    What, when, when someone pulls the cord

16  what happens?

17    A    You get both a visual and audio to the,

18  to communicate to a nurse that you have difficulty

19  and they need to come help you.

20    Q    Okay.  And where is the visual output?

21    A    I don't know if the visual is outside

1  the room itself, blinking outside the room or in

2  the nurses' station or both.

3       Q    Would that be significant in your

4  opinion?

5       A    No.

6       Q    Why not?

7       A    Because I'm just looking at the audio

8  part.  Visual is something that if you have your

9  back turned you have no input.  I mean if you are,

10 if it's, if it's outside the room, a flasher

11 outside the room and you're looking down the hall

12 the other way you, you wouldn't respond to it.  If

13 it's audio and it's outside the room and you hear

14 audio you would turn.  And oftentimes audio is the

15 first step to a visual.  You get an audio then a

16 visual.  I mean the audio will attract you to a

17 visual.

18       Q    Okay.  So they record or register

19 simultaneously?

20       A    Sort of like my alarm clock, I get the

21 audio and then I look at oh, my God, it's 6

1    certainly it's, I think anybody would understand

2    that situation, that if you put me in a room and I

3    can't go out of the room then I can't go down the

4    hall and be in another room.  I mean that's --

5         Q    I guess actually --

6         A    I don't have to be an expert to be that,

7    I --

8         Q    Well, I guess if -- you don't need --

9    but, but you have no expertise in what other

10   functions nurses perform on Halsted 8 or performed

11   on Halsted 8?

12        A    Only what I saw when I was there.  They

13   were moving around everywhere, but that's all.

14        Q    But you don't know what they were doing?

15        A    No, I didn't, I didn't quiz them, no, I

16   didn't.

17        Q    Okay.  And you don't have -- I mean I

18   guess is your opinion to a reasonable degree of

19   some sort of scientific certainty?

20        A    Sure.  We usually use the word

21   engineering certainty, reasonable degree of

1    engineering certainty, it's just above the

2    conclusions.

3        Q    Well, specifically I'm asking whether

4    your conclusion that there could be some impact on

5    patient well-being is to a reasonable degree of

6    engineering certainty?

7        A    Yeah, I think so.

8        Q    And what is it in your engineering

9    background that allows you to come to a conclusion

10   about what will and will not impact on patient

11   well-being?

12       A    That you can't be doing two things at

13   the same time.  You can't be in my room and you

14   can't be sitting at a monitor in another room at

15   the same time unless somehow you can cut yourself

16   in half and put half your body in one place and

17   half your body in the other.

18       Q    Okay.  Well, that's, the fact that you

19   can't be in two places at once doesn't require

20   expertise, does it?

21       A    No, I guess not.

1      Q    Ordinary jury can figure that out?

2      A    I would hope so.

3      Q    Okay.  And there's nothing particular in

4  the field of engineering about you can't be in two

5  places at once, correct?

6      A    I can't think of a calculation in that

7  regard, but in a general sense I guess that would

8  be something, if everybody in the jury can figure

9  it out I guess even an engineer could figure it

10  out.

11      Q    And the same for human factors I mean.

12      A    True.

13      Q    I want to go to your conclusions, if, if

14  I could.  And here you, you do say, you do say they

15  are to a reasonable degree of engineering

16  certainty.  And I want to go to number 3.  We've

17  discussed most of your opinions but number 3 says a

18  nurse lacking the ability to hear an audio signal

19  would only be able to know that a patient was

20  requiring attention by sitting full time in front

21  of a monitor in the nurses' station, do you see

1    Q    Okay.  Well, if you turn to page -- I'm

2   sorry, the last page.  Opinion 7, or conclusion 7.

3   Isn't implicit in that conclusion that with an

4   interpreter Ms. Searls would be able to effectively

5   operate as a nurse?

6    A    No.  I mean I haven't evaluated that.  I

7   mean that sentence says without a full-time skilled

8   language.  That doesn't mean that I've done a study

9   with a full time -- I haven't done that study

10   anyway.

11    Q    Okay.  So you don't have an opinion on

12   whether with an interpreter Ms. Searls would be an

13   effective nurse?

14    A    Right.  I don't know if the converse of

15   7 is true.

16    Q    Okay.  How much time have you devoted,

17   not counting today, how much time have you devoted

18   to this case, approximately?

19    A    Not an awful lot, I have to say, let me

20   see, Hopkins is not that far from me, 12 hours,

21   maybe 15 hours.