# EXHIBIT 9

Deposition of Maria M. Cvach                                          Searls v Johns Hopkins Hopsital

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2                       (Northern Division)

3    LAUREN SEARLS                    *
                                      *
4             Plaintiff              *
                                      *          Case No.:
5         v.                          *
                                      *          1:14-CV-02983-CCB
6    JOHNS HOPKINS HOSPITAL           *
                                      *
7             Defendant              *
                            * * * * * * * * *

8

9

10             The videotape deposition of MARIA M.

11   CVACH, DNP, RN, FAAN, taken on Friday, June 19th,

12   2015, commencing at 9:58 a.m., at the law offices

13   of Brown, Goldstein & Levy, LLP, 120 East Baltimore

14   Street, Suite 1700, Baltimore, Maryland 21202,

15   before Sharon A. Beaty, Notary Public.

16

17

18

19

20

21   Reported by:  Sharon A. Beaty, CSR

1          A     Okay.

2          Q     If you want a break at any time, just

3     let us know, we're happy to accommodate you, okay?

4          A     Okay.

5          Q     Where are you currently employed?

6          A     I'm currently employed at the Johns

7     Hopkins Hospital.

8          Q     And what do you do there?

9          A     I am an assistant director of nursing

10    and I do clinical standards.

11         Q     And what is, what do you do as an

12    assistant -- are those sort of two different pieces

13    of one job or is that one --

14         A     I have many different types of jobs, but

15    to sum it up I do the policies and procedures for

16    nursing and for our medical board.  I also was

17    assigned a project back in 2006 on alarm management

18    and so I was given the responsibility with our

19    biomedical engineering department of developing an

20    alarm management plan for our new clinical

21    buildings that we have opened up.

1        Q    And what buildings are those?

2        A    So our new buildings are the Zayed,

3   Bloomberg and the Nelson buildings.

4        Q    Hasn't Nelson been around for a while?

5        A    Nelson was gutted and redone.

6        Q    And day to day what do you do as

7   assistant director of nursing and being in charge

8   of clinical standards?

9        A    So I do a variety of different things.

10   I actually have an updated resume that, excuse me,

11   that indicates the types of things that I do.

12        Q    Is that --

13        A    Excuse me.

14        Q    That's fine.  Indicate -- Exhibit 29 is

15   the notice of today's deposition.  Is your updated

16   CV different from the one --

17        A    Yes, it is.

18        Q    Okay.  That we have marked as Exhibit

19   30.  Then why don't we mark that CV as Exhibit 32?

20        A    I'm sorry, I'm having --

21             MR. ESPO:  Do you need a break?

1  nursing, so any issues that come up related to the

2  care of patients, I manage that.  And as I've

3  mentioned, I was assigned a project in 2006 that

4  I've been doing since, it's on alarm management for

5  the hospital.

6      Q    When you say clinical standards of care,

7  I think for nurses; is that correct?

8      A    Correct, uh-huh.

9      Q    What does that entail?

10     A    The care of patients, how the policies,

11  procedures and protocols -- I oversee the

12  development of those for the care of patients.

13     Q    Okay.  Are those, would you describe

14  those as standards for the, the way nurses --

15     A    Practice.

16     Q    -- do their, do their jobs?

17     A    So standards of practice govern how a

18  nurse practices, whether they're licensed to do

19  things.  I, my job is more the care of patients, so

20  protocols for how to manage patients with

21  tracheostomies or how to manage falls or pressure

1    ulcers, things like that.

2         Q     They are -- I guess I'll muddle, muddle

3    through in my own way.  Are they, are they, do they

4    direct how nurses do certain tasks?

5         A     Yes.

6         Q     Okay.  And are they, do they implicate

7    who, other than licensing, do, does your work on

8    the standards of practice governing nurses deal

9    with who is qualified to perform certain tasks?

10        A     So I don't do standards of practice, I

11   do standards of care.  Standards of practice

12   decides who is qualified and so that is not my

13   primary job.

14        Q     Okay.  And when you say standards of

15   practice, are those, are the standards of practice

16   related to individual types of skills or are they

17   according to the state of Maryland you need to be

18   an RN to do X?

19        A     Yeah.  So again, my, my role, we have

20   two different directors, assistant directors.  My

21   role as an assistant director of nursing clinical

Deposition of Maria M. Cvach                                    Searls v Johns Hopkins Hopsital

1    standards is to look at how the job is done but not

2    who does it.

3         Q    Okay.

4         A    The person who does standards of

5    practice is a different assistant director of

6    nursing and she would be responsible for what kind

7    of licensure you need, who's qualified, whether or

8    not the Board of Nursing allows you to do certain

9    things, so I don't get into that.

10        Q    Does the hospital have any -- well,

11   strike that.

12             Within your sort of domain at the

13   hospital, is there, are there standards or

14   guidelines for whether individual nurses with a

15   particular disability can perform certain

16   functions?

17        A    You know, I don't know.  I have not

18   looked for that, whether there is that.  I'd have

19   to look that up, I'm not sure.

20        Q    Okay.  Not something that you have come

21   across in your --

1    A    No.  I don't -- yeah, I don't deal with

2    that.  I deal with the care of patients.  Yeah, I

3    haven't dealt with that.

4    Q    I should have said at the beginning of

5    the deposition, there's a temptation for both of us

6    to start talking before the other one is finished.

7    In ordinary conversation that's the way it happens.

8    A    Yes.

9    Q    Again, for the court reporter it's

10   really hard to take down two people talking at a

11   time, so I will try to wait for you and ask that

12   you do the same and hopefully Mr. Fries will speak

13   up if we're not doing a good job.

14        How long have you been the assistant

15   director of nursing clinical standards?

16   A    Since 2005.

17   Q    Okay.  And I know I have your CV, but

18   can you briefly outline your educational history

19   beginning with college?

20   A    I graduated from Bloomsburg State

21   College in 1981 with a Bachelor of Science in

1     Q     The hospital, either by direction to the

2  manager or the manager on his or her own

3  initiative, could have somebody monitor that

4  reporting station?

5     A     I wasn't involved in those decisions.

6     Q     I wasn't asking that.  I was asking is

7  it possible?

8     A     The manager assumes accountability for

9  how the unit is run.

10    Q     I want to ask you some other questions,

11 a little bit -- a few other questions about your

12 background.  Have you ever worked with a deaf

13 nurse?

14    A     Not with a deaf nurse, no.

15    Q     Worked with a deaf physician?

16    A     No.

17    Q     Ever worked with anybody who's deaf?

18    A     Worked with?  I have hearing impaired

19 but not completely deaf.

20    Q     And what was the work relationship with

21 this hard of hearing person?

1      Q     Do you know, aside from individuals who

2   you have worked with, do you know anybody who is

3   deaf?

4      A     Oh, yes.

5      Q     About how many people?

6      A     A handful.

7      Q     And are they social friends?

8      A     Some, I have a relative through marriage

9   who is completely deaf and she has a sign language

10  interpreter.

11     Q     What do you mean she has a sign language

12  interpreter?

13     A     When, whenever, like at weddings or

14  something like that there is a sign language

15  interpreter.

16     Q     Okay.  Do you sign?

17     A     No.

18     Q     Does your spouse sign?

19     A     No.

20     Q     Did you know that there is currently a

21  deaf nurse working at the University of Maryland

1  system?

2       A    No, I did not.  Only through reading

3  some documents, that's the only way I knew it.

4       Q    Okay.  Have you ever supervised a deaf

5  nurse?

6       A    No.

7       Q    Have you ever been offered as an expert

8  in, in any litigation involving the ability of a

9  deaf individual to function as a nurse?

10      A    Just this, just this.

11      Q    Just this case?

12      A    Yes.

13      Q    And what -- when were you asked to look

14  into this case?

15      A    I was asked in January of this year.

16      Q    And what were you asked to do?

17      A    I was asked to look at -- the unit had

18  already been closed, Halsted 8 had already been

19  closed, but I was asked to look at Halsted 8 from

20  my background knowledge on that unit and whether or

21  not a nurse who was deaf would be able to function

1    related to monitor alarms and any kind of alarms on

2    that unit.

3         Q    And what, if anything, were you told to

4    assume about the nurse's -- what, if any,

5    accommodations the nurse would be provided?

6         A    I was not really given that information.

7    I, all -- the only thing I remember being told is

8    that it was a nurse who was completely deaf.

9         Q    Okay.  Who told you that?

10        A    The attorney was John Gilman.

11        Q    And were you given any -- over the

12   course of your work in this case, were you provided

13   any other information either orally or in writing?

14        A    The only information I was provided, we

15   had a, we met and we reviewed the unit, Halsted 8,

16   we went -- we walked through it, it was already

17   des-, you know, not completely destroyed but there

18   was, it was not the same unit because a lot of

19   things had been pulled out already, but we walked

20   through that unit, we talked with the manager of

21   the unit, and of course I knew the unit because I

1        Q      When did you review those reports?

2        A      Between the end of January and

3    probably -- well, one of them I just received maybe

4    two or three weeks ago.

5        Q      Did you do any independent research in

6    how or whether there are deaf nurses working in

7    health care in the United States?

8        A      No.

9        Q      Do you have any knowledge of deaf nurses

10   working, delivering patient care in the United

11   States?

12       A      No.

13       Q      Do you have any knowledge in how deaf

14   health care providers work with sign language

15   interpreters?

16       A      No, just of my own experience of

17   somebody signing when I, when I'm lecturing

18   occasionally there's a sign language interpreter,

19   so I just have witnessed that but I don't have any

20   direct experience.

21       Q      Okay.  And you've never spoken with a

1    person who is working as a dedicated sign language

2    interpreter with a professional?

3         A    No.

4         Q    Do you know anything about the speed

5    with which American Sign Language communication can

6    be delivered?

7         A    No.

8         Q    Did you think it was important in your

9    work in this matter to know how or if deaf

10   professionals were working delivering patient care

11   in hospitals?

12        A    No, because I was being asked the

13   specific thing about alarms and the amount of

14   alarms, I wasn't specifically asked about

15   interpreters and the speed of which they interpret.

16        Q    What, when you say you were specifically

17   asked about alarms specifically, what were you

18   asked about alarms?

19        A    I was asked about the unit itself and

20   how many audible alarms a nurse would receive, a

21   hearing nurse would receive if working on that

1    Q    You said that you reviewed Dr. Pollard's

2    report.  You highlighted at page 6 of his report,

3    I'm going to show it to you so you can read it.

4    Can you just read the first highlighted sentence on

5    that page?

6    A    In reviewing these documents I could

7    find no evidence of job functions that could not be

8    performed by Ms. Searls or other deaf nurses if

9    they were provided with reasonable accommodations

10   per the ADA in Section 504.

11   Q    Do you have the experience and the

12   background to form an opinion as to whether with

13   reasonable accommodations, say a, a dedicated

14   trained sign language interpreter, whether

15   Ms. Searls could have performed the nursing

16   function on Halsted 8?

17   A    I think the answer is that it would have

18   been very difficult for Ms. Searls even with a sign

19   language interpreter to perform functions related

20   to telemetry monitoring, even with a sign language

21   interpreter, because as I've mentioned before of

1    the amount of nonactionable and nuisance alarms

2    that were occurring at that time.

3        Q     I'm really asking you a different

4    question.  Let me ask it --

5        A     Okay.

6        Q     Try it a different way.  What in your

7    background, education and training or research for

8    this case allows you to form an opinion to a

9    reasonable degree of probability about what a deaf

10   nurse is capable of doing?

11       A     I don't have direct experience with a

12   deaf nurse, all I have is experience with the

13   amount of alarms that were occurring and the lack

14   of equipment and the legacy equipment that was

15   available in that unit that would I think have been

16   difficult for a hearing nurse let alone a hearing

17   impaired or a deaf nurse.

18       Q     You not only have never worked with a

19   deaf nurse, you didn't do any research on deaf

20   nurses for this case?

21       A     (Nodding head indicating yes.)

1          Q     Correct?

2          A     That's correct.

3          Q     Is, is that -- at the very beginning of

4    the deposition we talked about, I asked you about

5    evidence-based medicine.

6          A     Yes.

7          Q     Is that evidence-based work in coming to

8    your conclusion in this case?

9          A     Is what evidence-based work?

10         Q     Not doing any research on the ability of

11   deaf nurses to work in other locations or doing a

12   literature review.

13         A     I was not asked about that.  My, what I

14   was asked to do was I was asked to look at the

15   alarms and the equipment on that unit, so I did not

16   see it as my role to look at deaf nurses and what

17   they're capable of doing.

18         Q     Let me turn to your report.  I'm going

19   to give you the marked, the one with the exhibit

20   tag.  If we could go all the way to the end of your

21   report where it says summary?

1          A    Yes.

2          Q    I'll trade you here.

3               What -- so I want to look at the first,

4     the first sentence, alarm management is a national

5     patient safety goal and a hospital priority.

6          A    Yes.

7          Q    Okay.  Sentinel events reported by the

8     Joint Commission indicate that patients have died

9     as a result of alarms being missed.  What does

10    sentinel mean in that sentence?

11         A    Sentinel means that there have been

12    deaths or very severe injuries reported as a

13    result.

14         Q    Okay.  And those are alarms -- do you

15    have any information that any of those sentinel

16    events took place because an alarm was missed by a

17    deaf nurse?

18         A    I do not have that information.

19         Q    Okay.  So is your assumption those were

20    alarms missed by hearing nurses?

21         A    Correct.

1      Q    Okay.  And then in 2012, skipping a

2   sentence, in 2012 nurses on this unit, that refers

3   to Halsted 8, correct?

4      A    Yes.

5      Q    Had to rely on audible alarm signals to

6   determine the level of alarm response that was

7   required.

8      A    Yes.

9      Q    It was critical that the nurses on

10  Halsted 8 be able to hear alarms at the nursing

11  station or while walking in the hallway to

12  determine the level of urgency required for the

13  situation.

14     A    Yes.

15     Q    Now, that is an assumption on your part

16  that it is actually the nurse who needs to hear it

17  rather than a trained sign language interpreter,

18  correct?

19     A    Yes.

20     Q    And you have no empirical data to

21  suggest that a trained sign language interpreter

1  couldn't effectively communicate that information

2  to a nurse?

3        A    Well, I have empirical data to show that

4  even a nurse has trouble interpreting those, but I

5  don't have anything about a sign language

6  interpreter.

7        Q    You certainly have no empirical data

8  that says that a sign language interpreter would

9  have more difficulty than a nurse?

10       A    I don't have anything to say they can or

11  can't.

12       Q    Okay.  So your next sentence is a deaf

13  nurse would not be able to respond quickly to these

14  alarms.

15       A    Yes.

16       Q    That is based on the -- that's built on

17  the assumption that there is no sign language

18  interpreter to provide the information to the deaf

19  nurse, correct?

20       A    It's built on that assumption and also

21  the fact that there were so many that it was even

1    about what the alarm is?

2            A     On that particular unit there were no

3    backup systems, it was very difficult, there were

4    so many alarms and there were no backup and so a

5    hearing nurse could make, could make a mistake or

6    miss something, and so could one that is deaf.

7            Q     Okay.  So that sort of leaves them even?

8            A     It was a bad unit, in my, in my opinion

9    it was a bad unit because they didn't have the

10   middleware and the backups available today.

11           Q     But again, you've done no research as to

12   whether it could have worked with a sign language

13   interpreter?

14           A     I have not done that research.

15           Q     Okay.  And then you say, your next

16   sentence is the time it would take to have someone

17   interpret for the deaf nurse could result in a

18   delayed patient response.

19           A     Yes.

20           Q     Okay.  First of all, how long would it

21   take for a sign language interpreter to communicate

1    alarm in room 12?

2         A    So I would imagine it would take less

3    than five seconds.

4         Q    You would imagine.  You don't really

5    know, do you?

6         A    I don't know.

7         Q    So that's another assumption?

8         A    Yes.

9         Q    And then -- so the fact that it could

10   result in a patient injury, is that more reason --

11   more probable than not, it's going to more probably

12   than not cause a patient injury?

13        A    From, at least with fall alarms, the

14   monitor, the fall monitor, you have to be in there

15   immediately when you hear that one, because they

16   are on the floor right away, so that one might,

17   might be one where harm could occur even within

18   seconds.

19        Q    So, but you don't know how long it will

20   take the, the interpreter to communicate the

21   information to the nurse?

1    A    I don't know but I know this:  That on

2  that unit they had no way to do it quickly because

3  they weren't getting information on the phone to

4  say fall alarm, room whatever.  You had to rely on

5  your hearing and then you had to look around and

6  say well, where is it, and so the interpreter would

7  have to say oh, I think I hear it coming from down

8  the hall, I think it's that room, so she'd have to

9  say that, in sign language she'd have to say I

10  think it's coming from this room, because there was

11  nothing to say where it was coming from, you relied

12  on your sound to know where to go.

13    Q    Okay.  So but the interpreter doesn't

14  have -- first of all, you don't know how long it

15  would take to sign I think it's coming from room

16  12?

17    A    Yeah.  I don't know.  This is what I

18  would imagine that the message would be.  I hear

19  something, it's fall alarm, I think it's coming

20  from room 12, and I have no idea how long that

21  would take to sign.

1    Q    You don't deliver medical care based on

2    what you assume, do you?

3    A    No.

4    Q    Are you offering your expert opinions in

5    this case based on what you assume?

6    A    I'm offering my opinions on my knowledge

7    about how that particular unit functions related to

8    audible alarms.

9    Q    The sentence we were just looking at

10   ends with potential patient injury.  Do you see

11   that?

12   A    Yes.

13   Q    What -- how, how do you evaluate the

14   degree of potential?

15   A    The degree -- I'm not sure what you're

16   asking.

17   Q    Well, typically in litigation I see when

18   I -- and you're probably familiar with this, the,

19   the standard is is something more probable than

20   not, and what I'm asking you, is it more probable

21   than not that having a deaf nurse with a qualified

1   sign language interpreter would result in more

2   patient injuries than a hearing nurse?

3        A    Is -- and is the assumption that the

4   deaf nurse has a sign language interpreter?

5        Q    The assumption is that the deaf nurse

6   has a qualified, dedicated sign language

7   interpreter.

8        A    I --

9        Q    Are you able to say to a reasonable

10  degree of probability that there would be more

11  patient injuries?

12       A    No.

13       Q    Are you aware that Ms. Searls responds

14  to codes in her present position?

15       A    I, I read that in, in her -- in

16  somebody's deposition.

17       Q    Okay.  Did you -- I'm looking at your

18  last sentence in the summary.  Additionally, a

19  delay in the nurse hearing an overhead pager

20  directions during a code situation could have

21  resulted in a delayed response.

1        A     Yes.

2        Q     Did what you read in that deposition

3   cause you to rethink the ability of a deaf nurse

4   with an interpreter to function during a code?

5        A     I have been in many many many codes, and

6   I can tell you it's chaos, having been in those

7   codes.  And there's a lot of noise and people

8   talking and you have to be very astute who you're

9   listening to, and so I personally feel that it

10  would be very difficult unless you know who the

11  leader of that code is and who to pay attention to

12  and what your assigned role is, I think it would be

13  very difficult to participate in a code situation.

14       Q     And what is the evidence of that with

15  respect to a deaf nurse compared to a hearing

16  nurse?

17       A     So as long as the deaf nurse knew what

18  their role was, what their role was in a code,

19  because when a code happens people assume certain

20  roles, they are either the medication nurse, they

21  are the nurse who's doing CPR, they are the nurse

1   who's bagging the patient, they are the nurse who's

2   documenting, so as long as you know what your

3   assumed role is and you know who to listen to, then

4   I think that it could be done.  But if you don't

5   know that information it's just -- you're not sure,

6   people are barking orders and you're not sure who

7   to listen to.

8          Q    So in a typical code who, who leads?

9          A    Until the medical resident gets there

10  it's pretty much people are just doing what they

11  think is the right thing to do.  There is no

12  leader, it's just somebody jumps on the chest and

13  does CPR, somebody gets the defibrillator, somebody

14  goes and gets the crash cart, somebody puts oxygen

15  on, so people just assume their roles until the

16  medical resident gets there.

17         Q    Okay.  So a deaf nurse could just assume

18  her role?

19         A    That's correct.

20         Q    And once the medical resident is present

21  everybody knows who's in charge?

1      A    Well, many doctors come and we don't

2    know who they are because they're not -- they're

3    assigned for the day so you're not exactly sure who

4    everybody is.  There's an anesthesiologist who

5    comes, there's a medical resident, there's a

6    pastor, there's a respiratory therapist, so all of

7    these people come and you hope that you know who

8    they are, but they say, they usually come in and

9    say I'm, I'm in charge, so that's how you would

10   know.

11      Q    Well, first of all, they know not to

12   listen to the pastor first, right?

13      A    Yes.  Yes.

14      Q    Okay.  So we can leave the pastor out of

15   it?

16      A    Yes.

17      Q    I mean if you're taking directions from

18   the pastor by definition it doesn't matter anymore?

19      A    That's right.

20      Q    But if somebody comes in and says I'm

21   the senior doctor, I'm in charge, again, a trained

1    interpreter will hear the words just as much as

2    hearing nurses?

3         A    Correct.

4         Q    And then knows -- and then two things,

5    one is can sign to a deaf nurse he's in charge?

6         A    Correct.

7         Q    And the second thing is she, or he,

8    whoever the interpreter is, knows who to listen to

9    so that he or she is relaying the correct

10   instructions to the deaf nurse?

11        A    Well, it's not one person though saying

12   things, there's multiple people talking, so there's

13   somebody in charge of putting a line in and there's

14   the doctor who's telling you what meds to give and

15   then there's the respiratory therapist and the

16   anesthesiologist saying what they need for

17   intubation, so there's a lot of people talking at

18   the same time.

19        Q    Okay.  Do you have any reason to believe

20   that what you read about Ms. Searls being able to

21   participate in, I'm not sure what the right term

1    is, but the care of a patient during code, during a

2    code is incorrect or inaccurate?

3           A    I don't have any reason to believe it's

4    incorrect.

5           Q    Okay.  So you don't, again, you don't

6    have any evidence that having a deaf nurse with a

7    dedicated sign language interpreter would in fact

8    result in patient harm during a code?

9           A    I don't have specific evidence on that,

10   no.

11          Q    Okay.  May I have your copy of the

12   various --

13          A    This?

14          Q    Not your report, the other materials.

15          A    Oh, can I just say that I did forget to

16   put the right date on my report, so it should be

17   dated 2015, and not 2014.  And what would you like,

18   what would you like?  This?

19          Q    That's fine.  That.  Thank you.

20               (Documents tendered.)

21          Q    Were you able to -- based on your

1    the unit and then shortly thereafter became the

2    nurse manager.

3         Q    Okay.  Did you ask Ms. Rotman when you

4    saw her at the sort of inspection of Halsted 8, did

5    you ask Ms. Rotman anything about Ms. Searls'

6    performance or abilities?

7         A    No.

8         Q    Are you familiar with Cardionics

9    stethoscope that works with hearing aids?

10        A    No, I'm not.

11        Q    And, and I understand you may not have

12   been asked to do this, but you didn't ask to go

13   observe Ms. Searls working in her current location

14   as part of your, your work on this case?

15        A    I did not -- I was not asked and I did

16   not witness that.

17        Q    Didn't seek it out?

18        A    Yes.

19        Q    I'm going to give you that back.

20             (Documents tendered.)

21        Q    Do you know Dr. McKee at all?