### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **LAUREN SEARLS,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No. 1:14-cv-02983-CCB** |
| **JOHNS HOPKINS HOSPITAL,** | * | |
| **Defendant.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

FORD & HARRISON LLP

By: _____/s/_____
    Jay R. Fries
    Federal Bar No.  01234
    jfries@fordharrison.com

By: _____/s/_____
    Kathleen A. Talty
    Federal Bar No. 022971
    ktalty@fordharrison.com

    Counsel for Defendant
    The Johns Hopkins Hospital

OF COUNSEL

FORD & HARRISON, LLP
502 Washington Avenue, Suite 400
Baltimore, MD 21204
Telephone: (410) 321-7310
Fax: (410) 821-7918

# TABLE OF CONTENTS

Page

I.   STATEMENT OF THE CASE ................................................................................................1

II.  FACTS ................................................................................................................................2

III. ARGUMENT .......................................................................................................................8

    A.   Ms. Searls Is Not Able To Make Out a *Prima Facie* Case of
        Failure to Accommodate ................................................................................................8

    B.   Providing Ms. Searls With a Full-Time ASL Interpreter Would Have Imposed
        An Undue Hardship on the Hospital's Operations ....................................................14

IV.  DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL
    SUMMARY JUDGMENT ................................................................................................16

    A.  Plaintiff Fails to Establish That Her Accommodation Request Was Reasonable............16

    B.  Ms. Searls Could Not Perform the Essential Function of the RN Position.....................18

    C.  Plaintiff is Unable to Refute the Hospital's Undue Hardship Defense ...........................20

    D.  Ms. Searls is Unable to Negate the Direct Threat Defense.............................................22

CONCLUSION ......................................................................................................................23

**TABLE OF AUTHORITIES**

**Cases**                                                                    Page

*Bryant v. Better Business Bureau of Greater Maryland*, 923 F. Supp. 720 (D. Md. 1996)…15, 20

*Crabill v. Charlotte Mecklenburg Bd. of Ed.,* 423 Fed. Appx. 314, 324 (4th Cir. 2011)………...13

*Domek v. Schaefer*, 2008 WL 2312730 *5 (D. Md. 2008)………………………………13, 16, 24

*EEOC v. Federal Express Corp.*, 513 F.3d 360 (4th Cir.), *cert denied* 555 U.S. 814 (2008)..11, 17

*EEOC v. Sara Lee Corp.*, 237 F.3d 349 (4th Cir. 2001) ……………………………………..…14

*EEOC v. Stoughton Trailers,* 2010 WL 2572813 (W.D. Wis. 2010) ……………………………20

*EEOC v. The Picture People, Inc.*, 684 F.3d 981 (10th Cir. 2012)………..……11, 12, 16, 18, 24

*EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103 (9th Cir. 2010)…………….…..……11, 17

*EEOC v. Womble Carlyle Sandbridge & Rice, L.L.P.*, 2015 WL 3916760
    (4th Cir. June 26, 2015)  ………………………………………………...…12, 13, 16, 24

*Fleetwood v. Hartford Sys., Inc.*, 380 F.Supp.2d 688 (D. Md. 2005)………………………...9, 11

*Hooven-Lewis v. Caldera*, 249 F.3d 259 (4th Cir. 2001)………………………………………….8

*Lamb v. Qualex,* 28 F. Supp.2d 374, 378 (E.D. Va. 1998), *aff'd* 33
    Fed.Appx 49 (4th Cir. 2002) …………………………………………………………15, 16

*Martinson v. Kinney Shoe Corporation*, 104 F.3d 683 (4th Cir. 1997)…………………..13, 16, 24

*Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89 (2nd Cir. 2015)……………………………..17, 18

*Ross v. Beaumont Hospital,* 687 F. Supp. 1115 (E.D. Mich. 1988) …………………………15, 22

*School Bd. of Nassau County v. Arline,* 480 U.S. 273 (1987) ………………………………..22

*Shin v. University of Maryland Medical System Corp.*, 369 Fed. Appx. 472
    (4th Cir. 2010) ……………………………………………………………………13, 16, 24

*Stephenson v. Pfizer, Inc.*, 49 F.Supp 3d 434 (M.D. N.C. 2014) ………………………..13, 16, 24

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) ……………………………………………..10

*Wilson v. Dollar General Corp.*, 717 F.3d 337 (4th Cir. 2013)……………………………………8

**Statutes**

Americans with Disabilities Act, 42 U.S.C. § 12112(a)………………..1, 8, 11, 13, 14, 16, 23, 24

Rehabilitation Act of 1973, 29 U.S.C. § 794.  Section 504………………………...1, 8, 14, 23, 24

29 C.F.R. § 1630 ………..…………………………………………………9, 11, 14, 17, 18, 22, 24

**Other Authorities**

Federal Rules of Civil Procedure, Rule 56 …………………………………………………………1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LAUREN SEARLS,               *

      **Plaintiff,**         *

      **v.**               *     **Case No. 1:14-cv-02983-CCB**

JOHNS HOPKINS HOSPITAL,    *

      **Defendant.**    *

*   *   *   *   *   *   *   *   *   *   *   *

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, The Johns Hopkins Hospital, ("Hopkins" or "the Hospital"), by and through its undersigned counsel, hereby, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, submits this Memorandum of Points and Authorities in support of its Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment.  For reasons more fully argued below, Defendant submits that its Motion should be granted because there are no material issues of fact in dispute and Defendant is entitled to judgment as a matter of law.

## I.  STATEMENT OF THE CASE

On September 19, 2014, Plaintiff Lauren Searls filed a suit in this Court against the Hospital alleging a failure to accommodate because of her disability in violation of Title I of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12112(a) and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.  On October 1, 2014, the Hospital answered Plaintiff's Complaint, denying all substantive allegations and asserting various affirmative defenses.  The parties then engaged in discovery.   Defendant now moves for summary judgment in its favor on all of Plaintiff's claims.

## II. FACTS

In July 2012, Lauren Searls, who is profoundly deaf, applied for a Registered Nurse/Nurse Clinician I position on Halsted 8, a nursing unit at the Hospital.  Deposition of Lauren Searls at p. 31, ls. 1-14 (hereinafter referred to as "Searls' Dep."), Searls' Dep. Ex. 4.[1]  A Nurse Clinician I's responsibilities include coordinating care for assigned patients and working collaboratively to optimize team performance.  Deposition of Robert Pollard (hereinafter referred to as "Pollard's Dep.") Ex. 44.[2] The job description for the Nurse Clinician I position identifies the critical competencies that are required of an incumbent which includes the need for "[h]ighly effective verbal communication and interpersonal skills to establish working relationships."  *Id.*  Among the essential functions identified in the job description for the Nurse Clinician I position are "safely and independently complet[ing] patient assignments," "[h]ighly effective verbal communication and interpersonal skills . . .", "communicat[ing] unresolved issues . . .", and "listen[ing] actively to opinions, ideas and feelings expressed by others . . ." Pollard's Dep. Ex. 44.[3]

---

[1] /   Excerpts from the deposition transcript of Lauren Searls and exhibits thereto are attached to this Memorandum as Defendant's Exhibit No. 1.  References to the deposition transcript will be identified by page and line citation.  The exhibits will be referenced using "Ex." and the number.

[2] /   Excerpts from Dr. Pollard's deposition transcript and exhibits thereto are attached to this Memorandum as Defendant's Exhibit No. 2.  References to the deposition transcript will be identified by page and line citation.  The exhibits will be referenced using "Ex." and the number.

[3] /   Ms. Searls expert witnesses, Dr. Robert Q. Pollard and Dr. Michael M. McKee, acknowledged that communicating with patients, doctors and other staff is an essential function for a staff nurse at an acute care hospital.  Deposition of Michael McKee (hereinafter referred to as "McKee's Dep.") at p. 24, l. 24 – p. 26, l. 13; Pollard's Dep. at p. 24, l. 19 – p. 26, l. 10.  Attached hereto as Exhibit No. 3 to this Memorandum are excerpts from Dr. McKee's deposition transcript which are identified by page and line citation.

2

Ms. Searls initially interviewed for the Nurse Clinician I position with Nurse Recruitment. Searls' Dep. at p. 31, l. 18 – p. 32, l. 2. She then interviewed with Ms. Stacey Rotman, Nurse Manager on Halsted 8. *Id.* at p. 32, l. 2 – p. 33, l. 2. Halsted 8 was an eighteen-bed medicine telemetry unit, (Deposition of Stacey Rotman (hereinafter referred to as "Rotman's Dep.") at p. 19, ls. 5-8;[4] Searls' Dep. at p. 21, ls. 6-10), caring for patients with a wide variety of conditions such as heart failure, HIV AIDS, cellulitis, pneumonia and lung disease.[5]   Rotman's Dep. at p. 19, l. 21 – p. 20, l. 2. Ms. Searls did not request an accommodation during the interviews with Nurse Recruitment or with Ms. Rotman. Searls' Dep. at p. 33, l. 21 – p. 34, l. 2. Following those interviews, a conditional offer of employment was extended to Ms. Searls in August, 2012. Rotman's Dep. Ex. 4.[6]

The August, 2012 letter advised Ms. Searls that "the offer of employment and start date are contingent upon successful completion of . . . a health screening and clearance by the Office of Occupational Health Services." Rotman's Dep. Ex. 4. The annual salary for the position was $59,508.80. Searls' Dep. at p. 36, ls. 1-14; Rotman's Dep. Ex. 4.

After Ms. Searls received her conditional offer letter, she raised for the first time in an e-mail communication with Ms. Rotman the fact that she wanted as a reasonable accommodation sign language interpreter services in order for her to perform her Nurse Clinician I job duties. Searls' Dep.

---

[4] /    Excerpts from Ms. Rotman's deposition transcript and exhibits thereto are attached to this Memorandum as Defendant's Exhibit No. 4. References to the deposition transcript will be identified by page and line citation. The exhibits will be referenced using "Ex." and the number.

[5]/    The Johns Hopkins Hospital closed the Halsted 8 unit in October 2014. Rotman's Dep. at p. 10, ls. 3-6.

[6] /    The date on the conditional offer of employment letter indicates a date of April 17, 2012. The April, 2012 date was, however, a typographical error and the correct date was August, 2012. Searls' deposition at p. 37, ls. 8-16.

at p. 40, ls. 9-11; Searls' Dep. Ex. 3.  Ms. Rotman advised Ms. Searls that the Office of Occupational

Health would facilitate that request.  Searls' Dep. at p. 40, ls. 12-15; Searls' Dep. Ex. 3.

Ms. Searls' pre-employment screening with Occupational Health took place on August 27,

2012 and Ms. Searls was seen by Ms. Mary Henderson, an Occupational Health nurse. Searls' Dep. at

p. 59, ls. 11-14.  During the pre-employment screening, Ms. Searls shared that she was deaf and that

she needed sign language interpreters.  Searls' Dep. at p. 42, l. 14 – p. 44, l. 17; Deposition of Rhodora

Osborn (hereinafter referred to as "Osborn's Dep.") Ex. 12.[7]  Ms. Henderson told Ms. Searls that Ms.

Rhodora Osborn, Affirmative Action/ADA Compliance Specialist from the Office of Workforce

Diversity, would be following up with Ms. Searls regarding her accommodation request.  Searls' Dep.

at p. 45, ls. 13-15; Osborn's Dep. at p. 13, l. 7 – p. 14, l. 8.   On August 27, 2012, Ms. Henderson

contacted Ms. Osborn, advising her of Ms. Searls' accommodation request.  Osborn's Dep. at p. 37, ls.

3-11; Osborn's Dep. Ex. 12.

Ms. Osborn then contacted Ms. Kate Demers[8], ADA Accessibility Consultant, about Ms.

Searls' accommodation request for full-time medical sign language interpreters.  Weeks' Dep. at p. 23,

ls. 1-3; Osborn's Dep. at p. 51, l. 11 – p. 52, l. 16; Osborn's Dep. Ex. 12.   As a result of that

notification, Ms. Demers began to research possibilities for interpreter services.  Weeks' Dep. at p. 28,

ls. 1-3.

---

[7] /     Excerpts from Ms. Osborn's deposition transcript and exhibits thereto are attached to this
Memorandum as Defendant's Exhibit No. 5.  References to the deposition transcript will be identified
by page and line citation.  The exhibits will be referenced using "Ex." and the number.

[8] /     Kate Demers is now Kate Weeks.  Her last name changed from Demers to Weeks in September
2013.  Deposition of Kate Weeks (hereinafter referred to as "Weeks' Dep.") at p. 5, l. 18 – pg. 6, l. 1.
Excerpts from Ms. Weeks' deposition transcript and exhibits thereto are attached to this Memorandum
as Defendant's Exhibit No. 6.  References to the deposition transcript will be identified by page and
line citation.  The exhibits will be referenced using "Ex." and the number.

Continuing the interactive process that began when Ms. Searls met with Ms. Henderson in

Occupational Health, Ms. Osborn spoke with Ms. Searls on September 6, 2012 to get a better

understanding of Ms. Searls' accommodation request.  Osborn's Dep. at p. 52, ls. 1-8; Searls' Dep. Ex.

5.  During the conversation, Ms. Searls stated that she wanted a team of medical interpreters that could

alternate during her work day because she did not want "any miscommunication" while she worked as

a Nurse Clinician I.  Osborn's Dep. at p. 51, l. 19 – p. 52, l. 8; Searls' Dep. at p. 50, l. 20 – p. 51, l. 2.

While Ms. Osborn was on a vacation, Ms. Demers e-mailed Ms. Searls on September 12, 2012

to provide her with an update on the accommodation process.  Searls' Dep. at p. 52, ls. 1-11; Searls'

Dep. Ex. 6.  Ms. Demers told Ms. Searls that she was in the process of gathering information about

interpreter services and was working with management and Occupational Health on the request.

Searls' Dep. at 52, ls. 7-11; Searls' Dep. Ex. 6.  She also advised Ms. Searls that her orientation date of

September 24, 2012 may need to be adjusted because of the pending accommodation request.   Searls'

Dep. Ex. 6.  Ms. Demers corresponded with Ms. Searls again on September 18, 2012 to provide her

with a further update on the accommodation process.  Weeks' Dep. Ex. 17.

During the review process, Ms. Demers provided nursing leadership with the estimated cost of

providing the requested accommodation.  Weeks' Dep. at p. 34, ls. 8-11.  The estimated yearly cost for

providing two full-time medical ASL interpreters to work with Ms. Searls was approximately

$240,000.  Weeks' Dep. at p. 32, ls. 15-16.  Ms. Rotman determined that the Halsted 8 budget did not

have the financial capacity to provide Ms. Searls with her requested accommodation.  Rotman's Dep.

at p. 61, ls. 14-18.  Similarly, Ms. Karen Davis, Director of Medical and Radiology Nursing, and Dr.

Karen Haller, Vice President of Nursing, determined that there were no available operating funds in

the Department of Medicine's budget to cover the cost for the full-time ASL interpreters for Ms.

Searls.  Rotman's Dep. at p. 62, l. 18 – p. 65, l. 12.

Because there were no available operating funds in the budgets for Halsted 8 or the Department of Medicine to absorb the yearly $240,000 cost for interpretative services for Ms. Searls, it would have been necessary to reduce labor costs by laying-off four full-time Registered Nurses on Halsted 8 to fund the requested accommodation of the two full-time interpreters.  Weeks' Dep. Ex. 20.  The reduction of four full-time nurses, however, would have compromised patient care with the reduction of patient/staff ratios.  *Id.*

After learning that neither Halsted 8 nor the Department of Medicine had the funding capacity to provide Ms. Searls with her requested accommodation, Ms. Demers explored alternative financial sources.  Weeks' Dep. at p. 35, ls. 13-21.   Ms. Demers was unable to find any outside funding sources.

As part of the on-going consideration of Ms. Searls' accommodation request, Ms. Osborn again spoke with Ms. Searls on September 20, 2012 about her request for the two full-time medical interpreters.  Searls' Dep. at p. 55, ls. 1-7; Osborn's Dep. at p. 51, ls. 7-8.  During their conversation, Ms. Searls clarified that she was only requesting one interpreter, not a team of two or more.  Searls' Dep. at p. 55, ls. 4-8; Osborn's Dep. at p. 52, l. 17 – p. 53, l. 9.  Ms. Searls maintained, however, that the only accommodation that she would agree to was a full-time ASL interpreter.  Searls' Dep. at 56, l. 16 – p. 57, l. 2.   No alternative accommodation was acceptable to her.   *Id.*

Ms. Osborn shared with Ms. Demers the clarification of Ms. Searls' request.  Rotman's Dep. Ex. 8.  Ms. Demers contacted the interpreting agency to determine the cost of providing one full-time ASL interpreter with medical terminology.  *Id.*  The yearly cost of providing one full-time ASL interpreter through the agency would be approximately $120,000, (*Id.*) which was twice the cost of Ms. Searls' annual salary.

After reviewing the factors related to providing a full-time ASL interpreter, Nursing

Management concluded that Ms. Searls's accommodation request was not reasonable and it was,

therefore, necessary to rescind Ms. Searls' provisional job offer.  Searls' Dep. Ex. 8.  Prior to notifying

Ms. Searls of the decision, Ms. Barbara West from Nurse Recruitment was contacted to determine if

there were other nursing positions for which Ms. Searls may have been eligible.  Weeks' Dep. at p. 66,

ls. 15-18.  Ms. West agreed to hold a nursing position open for Ms. Searls and to work with Ms. Searls

on identifying other potential positions.  Weeks' Dep. at p. 67, ls. 2-11.

Ms. Searls was informed of the Hospital's decision in a letter dated September 28, 2012.

Searls' Dep. Ex. 8.  The letter informed Ms. Searls that the Hospital was unable to provide her with

interpreter services because of the "effect on resources and operation of the department."  *Id.*

Additionally, Ms. Searls was advised that the Office of Nurse Recruitment would work with her to

identify vacant positions for which she was qualified and she was encouraged to contact Ms. West to

explore alternative positions.  *Id.*  Ms. Searls never contacted Nurse Recruitment, however.  Searls'

Dep. at p. 61, ls. 14-16.

On October 4, 2012, Ms. Searls sought reconsideration of the Hospital's decision.  Searls' Dep.

Ex. 9.  However, Ms. Searls did not provide the Hospital with any additional information concerning

her requested accommodation or propose any alternative accommodation in the letter.  Searls' Dep. at

p. 63, ls. 4-17; Searls' Dep. Ex. 9.  Rather, the only accommodation that remained acceptable to Ms.

Searls was a full-time ASL interpreter.  Searls' Dep. at p. 63, l. 18 – p. 64, l. 1.

In a letter dated October 10, 2012, Ms. Osborn informed Ms. Searls that the Hospital was

upholding its decision because she had not offered any additional accommodation options for the

Hospital to consider.  Searls' Dep. at p. 64, ls. 11-15; Searls' Dep. Ex. 10.  Ms. Osborn also urged Ms.

Searls to contact Nurse Recruitment about other job opportunities.  Searls' Dep. Ex. 10.  Again, Ms.

Searls declined to contact Nurse Recruitment.  Searls' Dep. at p. 64, l. 16-19.  Ms. Searls also did not

attempt to contact anyone at the Hospital after receiving Ms. Osborn's letter.  Searls' Dep. at p. 65, ls.

3-9.

## III.  ARGUMENT

> The ADA performs a number of laudatory functions, not the least of which is to protect
> disabled individuals from insidious discrimination by requiring employers to reasonably
> accommodate their disability.  The law, however, cannot remedy every misfortune.  It can
> only correct that which it prescribes to correct.

*Wilson v. Dollar General Corp.*, 717 F.3d 337, 344 (4th Cir. 2013)

This case squarely falls within the parameters of the ADA as stated by Judge Thacker in the

*Dollar General Corp.* decision.  Ms. Searls, who is a profoundly deaf Registered Nurse, requested an

accommodation that was outside the boundaries of what the ADA requires an employer to provide.

Thus, the Hospital did not violate the ADA when it declined to provide the accommodation.

### A.  Ms. Searls Is Not Able To Make Out A *Prima Facie* Case of Failure To Accommodate.

Ms. Searls contends that the Hospital's failure to provide her with a full-time ASL interpreter in

order for her to perform the essential functions of a Registered Nurse/Clinician I represents a violation

of the ADA.  To establish a failure-to-accommodate cause of action under the ADA, Ms. Searls must

show: "(1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that

the [Hospital] had notice of her disability; (3) that with reasonable accommodation [s]he could perform

the essential functions of the position; and (4) that the [Hospital] refused to make such

accommodations."  *Wilson*, 717 F.3d at 345 (*citations omitted*).[9]

---

[9]/      The standards used to determine Section 504 of the Rehabilitation Act violation are the same
standards used to determine if there has been a violation of Title I of the ADA.  *Hooven-Lewis v.
Caldera*, 249 F.3d 259, 268 (4th Cir. 2001).

Ms. Searls has the burden to prove that she was able to perform the essential functions of the Nurse Clinician I position for which she sought employment. *Fleetwood v. Hartford Sys., Inc.*, 380 F.Supp.2d 688, 697 (D. Md. 2005). The essential functions of a position "are the fundamental job duties of the employment position that the person with the disability holds or desires." 29 C.F.R. § 1630.2(n)(1).

In determining what job duties are essential, courts look to such evidence as written job descriptions and the "consequences of not requiring the incumbent to perform the function" in order to determine if a job function is essential. *Fleetwood,* 380 F.Supp.2d, at 698-699 (*citations omitted*). "[I]f an employer has prepared a written job description before advertising or interviewing applicants for the job, this description is considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

A number of the duties listed in the Nurse Clinician I job description establish that communication is an essential job function. For example, the job description states that nurses are responsible for "safely and independently complet[ing] patient assignments" and maintaining "highly effective verbal communication and interpersonal skills." Pollard's Dep. Ex. 44. Defendant's expert witnesses confirmed that the auditory component of a Clinician I's job duties is an essential function because, among other alarm systems on the Halsted 8 unit, the central monitoring system on Halsted 8 alerts registered nurses with a series of different auditory beeps of events in a patient room that require a nurse's attention, Deposition of Clyde Richard, Ph.D. (hereinafter referred to as "Richard's Dep."), Ex. 23 and figure 4,[10] and the patient cardiac alarms emit varying types of sounds that distinguish the

_____

[10]  /    Excerpts from Dr. Richard's deposition transcript and exhibit thereto are attached to this Memorandum as Defendant's Exhibit No. 7.  References to the deposition transcript will be identified by page and line citation.  The exhibit will be referenced using "Ex." and the number.

level of urgency for a nurse's response.  Deposition of Maria Cvach (hereinafter referred to as

"Cvach's Dep."), Ex. 31.[11]  Furthermore, Ms. Searls' expert witnesses acknowledged that the ability to

communicate with patients, doctors, and other members of the staff and to respond to alarms and pages

are essential functions for a nurse working on an acute care unit.  McKee's Dep. at 24, l. 17 – p. 25, l.

1; Pollard's Dep. at 25, l. 10 – p. 26, l. 10.

Further, Ms. Searls admits that communicating, which includes the subset of monitoring and

responding to patient alarms, represents essential functions of the nursing position that she could not

perform without the full-time assistance of an ASL interpreter.  *See* Plaintiff's Memorandum in

Support of Her Motion to Strike Defendant's Expert Witnesses at p. 10.  In point of fact, Ms. Searls

concedes that her inability to monitor and to respond to patient alarms without an ASL interpreter "is

not a disputed point" in this case.  *Id.*

In that there is no dispute that communicating is an essential function of the nurse position and

that Ms. Searls is unable to perform that essential function without an accommodation, the question

then becomes whether the accommodation sought by Ms. Searls was reasonable.  The burden is on Ms.

Searls to show that her requested accommodation would "seem reasonable on its face, *i.e.* ordinary or

in the run of cases."  *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002).  Ms. Searls is unable to

make the required showing.

---

[11] /     Excerpts from Ms. Cvach's deposition transcript and exhibit thereto are attached to this
Memorandum as Defendant's Exhibit No. 8.  References to the deposition transcript will be identified
by page and line citation.  The exhibit will be referenced using "Ex." and the number.

It is undisputed that the only accommodation that Ms. Searls sought and the only accommodation that was acceptable to her was a full-time ASL Interpreter.[12]  Searls' Dep. at p. 47, ls. 1-3; p. 52, ls. 15-19; p. 56, l. 16 – p. 57, l. 2; p. 62, ls. 5-9.  She refused to consider any other accommodation.  *Id.*

An accommodation is not reasonable if it would eliminate an essential job function. *Fleetwood, supra*, 380 F.Supp.2d at 700.  The Equal Employment Opportunity Commission's ("EEOC") ADA regulations are very clear on this point:

> An employer or other covered entity is not required to reallocate essential functions.  The essential functions are by definition those that the individual who holds the job would have to perform, with or without reasonable accommodation, in order to be considered qualified for the position.  For example, suppose a security guard position requires the individual who holds the job to inspect identification cards.  An employer would not have to provide an individual who is legally blind with an assistant to look at the identification cards for the legally blind employee.  In this situation the assistant would be performing the job for the individual with a disability rather than assisting the individual to perform the job.

29 C.F.R. Part 1630 – Appendix, § 1630.2(o).

Consistent with the EEOC's regulations, courts have uniformly found that the hiring of a full-time assistant to perform an essential job duty or relieving an employee from performing an essential function is not a reasonable accommodation.  For example, in *EEOC v. The Picture People, Inc.*, 684 F.3d 981 (10th Cir. 2012), the EEOC alleged that The Picture People engaged in disability discrimination by failing to accommodate a profoundly deaf employee.  *Id.* at 984.  Verbal

---

[12] /    Ms. Searls' accommodation request for full-time ASL interpreters is distinguishable from the line of accommodation cases where an employer refused to provide temporary interpreter services at staff meetings, *EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103 (9th Cir. 2010), or at mandatory meetings and training sessions.  *EEOC v. Federal Express Corp.*, 513 F.3d 360 (4th Cir.), *cert denied* 555 U.S. 814 (2008).  Here, Ms. Searls wanted the Hospital to provide her with a permanent ASL interpreter who would function by her side throughout her 40 hour a week work schedule in order to hear the patient alarms and monitors and notify her when they required her response.  Ms. Searls did not request, as was the case in *UPS Supply Chain Solutions* and *Federal Express Corp.*, temporary interpretive services for meetings or training sessions.

11

communication with customers was an essential function of the employee's position.  *Id.* at 986.

Nevertheless, the EEOC argued that the employee should have been able to communicate with

customers through non-verbal means of communication.  *Id.* at 986-87.  The court rejected the EEOC's

argument, stating that "[i]t is axiomatic…that an employer is not required to relieve an employee of an

essential job function."  *Id.* at 987.

Next, the Tenth Circuit considered the EEOC's argument that The Picture People was required

to provide ASL interpreters "at staff meetings and training sessions".   In rejecting that argument, the

court stated:

> This case is different.  Employee's position as a performer required her to communicate
> extensively with customers . . . . Providing Employee with an ASL interpreter at staff
> meetings would not ameliorate her inability to interact verbally with customers – an
> essential function of the performer job. . . . **No reasonable accommodation has been
> suggested that would allow the Employee to perform her job given these constraints.**
>
> *Id.* at 988 (emphasis added).

Implicit in the rationale of the Tenth Circuit is the rejection of the accommodation sought by Ms.

Searls in this case.  If the provision of a temporary ASL interpreter for staff meetings is not a

reasonable accommodation because the ability to interact with customers is not only essential but a

full-time function of the job, clearly the provision of a full-time ASL interpreter, which would transfer

the essential function of verbal interaction to another employee on a full-time basis, is not reasonable.

Furthermore, the Tenth Circuit distinguished other cases holding that an employer may be

required to provide an ASL interpreter for meetings or training sessions, noting that in those cases

"there is nothing to indicate that the employee needed [an ASL interpreter] to perform the essential

functions" of the employee's job.  *The Picture People,* 684 F.3d at 988.

The Fourth Circuit has also addressed the question of whether an accommodation is reasonable

when it involves the reallocation of essential functions.  In *EEOC v. Womble Carlyle Sandbridge &*

*Rice, L.L.P.*, 2015 WL 3916760 (4th Cir. June 26, 2015), the plaintiff was no longer able to lift more than 20 pounds, which was an essential job function, because of a disabling medical condition. *Id.* at *1-4. The EEOC argued that the employer violated the ADA by failing to provide her with the regular assistance of other employees to perform the heavy lifting function. *Id.* at *4. The Fourth Circuit soundly rejected the EEOC's argument, finding that "requiring assistance for all tasks that involve lifting more than 20 pounds would reallocate essential functions, which the ADA does not require." *Id.* *7. *See also Crabill v. Charlotte Mecklenburg Bd. of Ed.,* 423 Fed. Appx. 314, 324 (4th Cir. 2011)(ADA did not require an employer to reallocate essential job functions.)

Similarly, in *Martinson v. Kinney Shoe Corporation*, 104 F.3d 683 (4th Cir. 1997), a shoe salesperson with epilepsy was unable to provide store security, which was an essential function of the salesperson's position, when the salesperson had seizures. *Id.* at 687. The Fourth Circuit held that "no reasonable accommodation was possible" to allow the plaintiff to perform the essential security function. In reaching that conclusion, the court stated:

> To accommodate [the salesperson] adequately, Kinney would need to hire an additional person to perform the essential security function of Martinson's job. The ADA simply does not require an employer to hire an additional person to perform an essential function of a disabled person's position.

*Id.* *See also e.g. Stephenson v. Pfizer, Inc.*, 49 F.Supp 3d 434, 442 (M.D. N.C. 2014)(holding that it was not a reasonable accommodation to require the employer to employ a full-time driver for a legally blind outside sales person.); *Shin v. University of Maryland Medical System Corp.*, 369 Fed. Appx. 472, 482 (4th Cir. 2010)(holding that a medical resident's request for a reduced patient load was not reasonable within the meaning of the ADA because handling a full patient load was an essential function of the medical resident position.); *Domek v. Schaefer*, 2008 WL 2312730 *5 (D. Md.

13

2008)(The Rehabilitation Act does not require an employer to eliminate essential job functions in order to accommodate a disabled employee.)

Ms. Searls' accommodation request is identical to the accommodations that the courts have regularly held to be unreasonable.  In order for Ms. Searls to be able to monitor and to respond to patient alarms, and to understand verbal communication from patients, patient families, doctors, and other staff, essential functions of the Nurse Clinician I job, she wanted the Hospital to retain or to hire a full-time (40 hour a week) ASL interpreter to perform the essential function for her.  As the EEOC and the courts make clear, employers are not obligated to reallocate essential job duties or to hire an additional person to perform the essential functions in order to accommodate a disabled employee.  Therefore, Ms. Searls' accommodation request was not reasonable and the fact that the Hospital did not provide the requested accommodation did not violate the ADA.

**B.  Providing Ms. Searls With A Full-Time ASL Interpreter Would Have Imposed An Undue Hardship On The Hospital's Operations.**

Assuming for purposes of argument only that it is found that Ms. Searls is able to prove the necessary elements of a failure-to-accommodate claim, Ms. Searls cannot overcome summary judgment because providing her with a full-time ASL interpreter would have caused on undue hardship on the Hospital's operations.  The ADA and Rehabilitation Act do not require employers to accommodate an employee when providing the accommodation would impose an undue hardship on the employer.  *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 353 (4th Cir. 2001); 29 C.F.R. Part 1630 – Appendix, Section 1630.2(p).

Undue hardship "means, with respect to the provision of an accommodation, significant difficultly or expense incurred…." 29 C.F.R. Part 1630 – Appendix, Section 1630.2(p).  When determining whether an accommodation would cause an undue hardship, courts look to the factors

14

such as: "(1) financial cost; (2) additional administrative burden; (3) complexity of implementation; and (4) any negative impact on the operation of the employer's business, including the accommodation's effect in the workplace." *Bryant v. Better Business Bureau of Greater Maryland*, 923 F.Supp. 720, 737 (D. Md. 1996).

Providing Ms. Searls with her requested accommodation would have imposed a significant financial cost on the Hospital. To provide Ms. Searls with one full-time ASL interpreter would have required a yearly expenditure of $120,000, (Rotman's Dep. Ex. 8), which was more than twice Ms. Searls' yearly starting salary of $59,508. *Id.* Neither of the operating budgets of the Halsted 8 unit nor the Department of Medicine, in which Halsted 8 was then located, had the budgeted resources to absorb the additional $120,000 cost.

The funding of Ms. Searls' accommodation request would also have had a negative impact on Halsted 8's administrative operations. In order to fund the $120,000 annual cost, the nursing unit would have needed to lay-off at least two full-time Registered Nurses. *See* Weeks' Dep. Ex. 20. The elimination of the two full-time Registered Nursing positions would have created an unsafe nurse-to-patient ratio on the unit and adversely affected patient safety. *Id.* Courts have recognized that patient safety is a significant consideration when determining if an accommodation is reasonable. *Ross v. Beaumont Hospital,* 687 F. Supp. 1115 (E.D. Mich. 1988).

Ms. Searls' requested accommodation is similar to that in *Lamb v. Qualex,* 28 F.Supp.2d 374, 378 (E.D. Va. 1998), *aff'd*, 33 Fed. Appx 49 (4th Cir. 2002). In *Lamb*, the plaintiff requested an accommodation for his disabling medical condition that would have allowed him to switch from a full-time to a part-time position. 28 F.Supp.2d at 376. Providing the requested accommodation would have required his employer to create a new position. *Id.* The court held for the employer because "[a]n accommodation imposes an undue hardship if it requires elimination of the essential duty of the

15

position in question." *Id.*  The court also found that the accommodation would impose an undue hardship on the employer because it would threaten customer service, alter employment patterns, and significantly increase expenses.  *Id.* at 379.

Like the plaintiff in *Lamb*, Ms. Searls' accommodation request would have imposed an undue hardship because it would have compromised patient safety, altered employment practices and significantly increased expenses.  In point of fact, Ms. Searls' requested accommodation would have imposed a greater hardship on the Hospital than the requested accommodation in *Lamb* because, unlike in *Lamb*, providing Ms. Searls with her requested accommodation would have compromised patient safety.

## IV.   DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.   Plaintiff Fails to Establish That Her Accommodation Request Was Reasonable.

Ms. Searls' argument in her Partial Motion for Summary Judgment concerning the supposed reasonableness of her request for a full-time, permanent ASL interpreter to work by her side in order to perform an essential function is not surprisingly devoid of a citation to a single court decision in support of her contention because no such case law exists.  To the contrary, every case which has considered the question of whether it is reasonable to require an employer to reallocate essential functions or to hire another individual to perform the essential functions for the disabled employee has ruled that the accommodation request is unreasonable.  *See, e.g., The Picture People, supra*; *Womble Carlyle Sandbridge & Rice, L.L.P., supra*; *Martinson, supra*; *Stephenson, supra*; *Shin, supra; Domek, supra.*

Ms. Searls' citation to the ADA and the EEOC regulations for the proposition that qualified interpreters are presumptively a reasonable accommodation in all situations is also not persuasive.

16

First, the EEOC expressly states in its regulations that "[a]n employer or other covered entity is not required to reallocate essential functions."  29 C.F.R. Part 1630-Appendix, § 1630.2(o).   Further, the regulations state, by way of example, that an employer would not have to provide or hire an individual to perform an essential function that the disabled individual was unable to perform.   *Id.*

Second, those cases which have found the provision of interpretive services to be reasonable have done so <u>only</u> when the interpretive services are temporary in nature and are provided for training sessions or mandatory employment meetings.  *See, e.g.*, *UPS Supply Chain Solutions*, 620 F.3d at 111-13; *Federal Express Corp.*, 513 F.3d at 365.  In none of the cases where the court found a request for interpretive services to be reasonable was the disabled person, such as Ms. Searls, requesting the permanent assignment of an ASL interpreter for a full 40-hour work week schedule to perform an essential function of a job.

Furthermore, Ms. Searls' reliance on *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89 (2nd Cir. 2015) to supposedly buttress her argument that her accommodation request was reasonable is sorely misplaced.  While the quote concerning interpreters being a form of reasonable accommodation that Plaintiff attributes to the court is correct, the Second Circuit was not stating an absolute rule as Ms. Searls would try to suggest.  Rather, in the very same paragraph of the attributed quote, the court held that:

> Per se rules are unreliable in the disability context, so ASL interpretive services may not *always* constitute a reasonable accommodation.

*Id.* at 96 (*emphasis in original*).

Moreover, the *Noll* court ruled against the deaf plaintiff, finding his accommodation request was unreasonable.  The plaintiff in *Noll* had been provided over the course of his employment with temporary ASL interpretive services for live business meetings and corporate intranet content.  *Id.* at

17

93.  Now, however, Mr. Noll wanted all the video and audio files stored on the corporate intranet to be captioned when posted.  He did not want the temporary interpretive services that had been provided because he viewed the services as inconvenient.  The court rejected the plaintiff's contention and found that the already provided accommodation was reasonable.

It is undisputed that the decided cases and the EEOC regulations expressly reject Ms. Searls' contention that her request for a full-time ASL interpreter to work by her side and to perform in her place an essential job function was reasonable.

### B.      Ms. Searls Could Not Perform the Essential Function of the RN Position

Contrary to Ms. Searls' argument that she could perform the essential functions of the Registered Nurse position, it is clear that Ms. Searls is only able to perform in the Registered Nurse role if an essential function of the position is allocated to an ASL interpreter.   In fact, Ms. Searls acknowledges that she could not monitor and respond to the patient alarms on Halsted 8 unless an ASL interpreter monitored the alarms and alerted her to the sounds of those patient alarms.  *See* Plaintiff's Motion to Strike Defendant's Expert Witnesses at p. 10.

Reasonable accommodations are defined in the EEOC regulations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed *that enable an individual with a disability who is qualified to perform the essential functions of that position.*"  29 C.F.R. § 1630.2(o)(1)(ii)-(iii). (emphasis added). Enabling a disabled individual to perform the essential functions does not mean relieving the disabled individual of the essential function or reallocating an essential function to another individual to complete. *The Picture People, Inc.,* 684 F.3d at 987.   Ms. Searls admittedly is unable to perform an essential function of the Registered Nurse position without a full-time ASL interpreter.   Ms. Searls is,

therefore, not qualified because the reasonable accommodation that she wanted would not have "enabled" her to perform the essential function, but would have eliminated the essential function.

Additionally, Ms. Searls' performance during her brief clinical rotation on Halsted 8 and her subsequent performance at Strong Memorial Hospital is not conclusive on the question of whether she was qualified to perform the essential functions of a licensed Registered Nurse on Halsted 8. During Ms. Searls' clinical student rotation on Halsted 8, which was an approximate duration of only four weeks (Plaintiff's Memorandum in Support of her Partial Motion for Summary Judgment, Ex. 2 at para. 5 – Plaintiff was on Halsted 8 for 14, 12-hour shifts), she did not work independently as a Registered Nurse, as she would have been expected to perform if employed on Halsted 8 as a licensed nurse. Rather, while she was on the unit in the capacity as a nursing student, she was "supervised directly" by a licensed nurse and could perform "most duties that a nurse would perform, assessment and medication administration as long as the, nurse was supervising her."  Rotman's Dep. at p. 27, ls. 4-10. There is not a shred of evidence establishing that Ms. Searls performed the essential function of communicating and responding to patient alarms while she was on Halsted 8 in her role as a student nurse. Thus, her short-term rotation on Halsted 8 is of no import.

Similarly, Ms. Searls' alleged performance at Strong Memorial Hospital does not establish that she was qualified to perform the essential functions of a Registered Nurse on Halsted 8. Halsted 8 was an eighteen (18) bed medicine telemetry unit and twelve (12) of the beds were equipped with patient alarms for the cardiac patients. Rotman's Dep. at p. 19, ls. 1-12; Cvach's Dep. at p. 83, ls. 12-13 and Ex. 31. On the Halsted 8 unit, there were auditory alarms on the central monitoring system, CPAP machines, IV pumps and the patient beds. Rotman's Dep. at p. 21, l. 16- p. 23, l. 12.  At Strong Memorial Hospital, Ms. Searls does not work on a medicine telemetry nursing unit. She works on an

oncology unit.  Searls' Dep. at p. 73, ls. 9-11.  Comparing a Registered Nurse's duties on a telemetry unit with a Registered Nurse's duties on an oncology unit is like comparing apples to oranges.

In *EEOC v. Stoughton Trailers,* 2010 WL 2572813 (W.D. Wis. 2010), the court rejected an argument similar to the one that Ms. Searls attempts to make here.  In *Stoughton Trailers,* the EEOC argued that because the plaintiff had worked in different shops and factories that he was thus qualified to work at Stoughton Trailers.  The court, however, found that the EEOC's argument was of "no moment" because there was no evidence that the two work environments posed the same conditions. *Id.* at *10.  As the court found in *Stoughton Trailers*, Ms. Searls' work at Strong Memorial Hospital on the oncology unit is of "no moment" to whether she was qualified to perform the Registered Nurse role on Halsted 8, which was a medicine telemetry unit.

### C.  <u>Plaintiff is Unable to Refute the Hospital's Undue Hardship Defense</u>

Although the undue hardship defense involves a "multi-faceted, fact intensive inquiry", *Bryant v. Better Business Bureau of Greater Maryland, Inc.,* 923 F.Supp at 737, Ms. Searls singularly focused on only one aspect of the multi-faceted inquiry, the financial cost, in an attempt to argue that the defense was not available to Hopkins.  *Id.*(citations omitted).

Because Ms. Searls initially requested that the Hospital provide her with two full-time ASL interpreters, the Hospital first explored the cost for the provision of that accommodation.  Contacting CIRS, which is a Baltimore based interpretive service that the Hospital uses to assist deaf or hearing impaired patients (Searls' Dep. Ex. 5), the Hospital determined the annual cost would be $240,000 for

a team of interpreters.  Weeks' Dep. at p. 32, ls. 9- 19.  Thus, the cost for one full-time ASL interpreter would be $120,000.[13]

While Ms. Searls summarily dismisses the cost of providing her with the only accommodation that she deemed acceptable, the very real and practical effects of that cost cannot be ignored.   In order to provide the demanded accommodation meant that the Hospital would been have required to expend for her employment three times the regular salary cost for the employment of a Registered Nurse, *i.e.*, Ms. Searls' annual salary was $59,508 and the annual salary for one full-time ASL interpreter was $120,000.   The accommodation cost was an undue hardship to the Hospital.

A further factor establishing the undue hardship is the impact of the requested accommodation on the Halsted 8 nursing unit.  Defendant's expert witnesses testified concerning the different auditory alarms that were emitted from the various machines and monitors that were on Halsted 8.   (Richard's Dep. Ex. 23; Cvach's Dep. Ex. 31).  Ms. Cvach testified that nurses, who work with telemetry and monitors, acquire the skill to distinguish the varying cardiac alarms.  Cvach's Dep. at p. 51, ls. 1-4. Moreover, Ms. Cvach testified that: "Nurses would know what it means when they see a certain [arrhythmia] rhythm because they've had that training course and they are associating that rhythm with that tone."  *Id.* at p. 50, ls. 11-14.   Ms. Searls is unable to monitor and to respond to the patient alarms without an ASL interpreter.   In order to provide the requested accommodation, the nursing unit would have had to abdicate the clinical skills and training of a licensed Registered Nurse to a non-licensed individual, the ASL interpreter, who would be monitoring the patient alarms and machines and then

---

[13] /     Contrary to Ms. Searls' contention that her expert, Dr. Michael M. McKee testified that the typical salary range was between $50,000 to $60,000 for an interpreter in Baltimore, he did not.  Dr. McKee specifically testified when asked whether he was aware of the annual salary paid to medically trained ASL interpreters in the Baltimore area "Not in the Baltimore area, but I do explore…so here at University of Michigan and also Texas, Rochester, starting salary for medical…..   McKee's Dep. at p. 37, ls. 21-25.

determining, without any nursing education, whether Ms. Searls was required to respond to the alarm. Clearly, the relinquishment of a licensed nursing function to non-licensed personnel borders on malpractice and constitutes an undue hardship.

**D.      Ms. Searls is Unable to Negate the Direct Threat Defense.**

Ms. Searls devotes a considerable portion of her Memorandum for Partial Summary Judgment attacking the Hospital's direct threat defense.  She is unsuccessful in her attack.  An individual is not qualified to complete a position if she "poses a direct threat to the health or safety of others because of [her] disability that reasonable accommodation cannot eliminate."   A direct threat is "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."  29 C.F.R. Part 1630 – Appendix, § 1630.2(r).  Determining whether an individual poses a direct threat to safety "requires consideration of several factors, including the nature, duration, and severity of the risk, and the probability that potential injury will occur." *See School Bd. of Nassau County v. Arline,* 480 U.S. 273, 288 (1987).

Courts have acknowledged that patient safety is an important consideration when determining whether an employee is qualified for a healthcare position.  For example, in *Ross v. Beaumont Hospital*, *supra*, the court stated "[w]here the lives of critically ill patients are at stake, public policy may dictate exclusion if there is any doubt concerning an individual's ability to serve such patients." 687 F.Supp. at 1121 (*citation omitted*).  As the record reflects, the Hospital had significant patient safety concerns about Ms. Searls' ability to respond to, and distinguish between, audible alarms and respond to critical patient situations.  Rotman's Dep. at p. 37, l. 15 – p. 38, l. 2; p. 56, ls. 17-21; Rotman's Dep. Ex. 8.  The concerns included Ms. Searls ability to function safely even if she was provided with a full-time ASL interpreter.  For example, Ms. Rotman was concerned that Ms. Searls would not be able to manage the demands of a nurse position on Halsted 8 such as "unexpected phone

calls, call bells ringing and critical patient situations" if she was relying on one interpreter.  Rotman's

Dep. Ex. 8.

It is undisputed Ms. Searls is unable to monitor and to respond to alarms without an ASL

interpreter.  The central monitoring system on Halsted 8, the system responsible for monitoring

patients' heart rhythms, was only visible from the nursing station and at the end of the hallway.

Rotman's Dep. at p. 46, ls. 3-13.   In addition, some of the alarms did not have a visual component.

Rotman's Dep. at p. 24, ls. 1-19.  It would have been a significant patient safety risk to rely on an

interpreter, without any nursing training, to engage in nursing judgment by determining which alarm

was sounding and to rely on the interpreter's  judgment to determine when a patient emergency was

occurring, requiring nursing assistance.  Delegating a licensed nurse's duties to non-licensed personnel

amounts to medical malpractice and represents a direct threat to patient care.

### IV.  CONCLUSION

The fundamental question in this case is whether the Hospital was required to employ a full-

time (40 hour week) ASL interpreter to perform certain of the essential functions of the Registered

Nurse position that Ms. Searls was undisputedly unable to perform in order to satisfy its obligation

under the ADA to provide a provide a reasonable accommodation to a disabled person.  A "no" answer

to that question ends the inquiry and a finding that the Hospital did not violate the ADA or the

Rehabilitation Act must follow.

Ms. Searls ignores that fundamental question by giving only a cursory consideration to her

burden of establishing a *prima facie* case of failure to accommodate and instead focuses her energies

on challenging an employer's affirmative defenses.   However, the issue of an employer's affirmative

defenses only comes into consideration if an employer violates the ADA.

23

As Defendant's Memorandum in Support of Its Motion for Summary Judgment fully establishes, the courts have uniformly held that an employer is not required under the ADA or the Rehabilitation Act to reallocate essential functions or to hire an assistant to perform the essential functions in order to meet its obligation to accommodate a disabled person.  *See e.g. The Picture People, supra*; *Womble Carlyle Sandbridge & Rice, L.L.P., supra*; *Martinson, supra*; *Stephenson, supra*; *Shin, supra; Domek, supra.*  The EEOC regulations are in full accord with these court decisions. 29 C.F.R. Part 1630 – Appendix, Section 1630.2(o).

Because Ms. Searls' request for a full-time ASL interpreter/assistant was not reasonable under the decided cases, the Hospital did not violate the ADA or the Rehabilitation Act when it declined to provide the accommodation.    Therefore, the Hospital's motion should be granted and summary judgment should be entered for the Hospital on all allegations of Plaintiff's Complaint and Plaintiff's Motion for Partial Summary should be denied in its entirety.

Dated:   October 9, 2015

Respectfully submitted,

FORD & HARRISON LLP

By:    _____/s/_____
Jay R. Fries
Federal Bar No.  01234
jfries@fordharrison.com

By:    _____/s/_____
Kathleen A. Talty
Federal Bar No. 022971
ktalty@fordharrison.com

Counsel for Defendant
The Johns Hopkins Hospital

OF COUNSEL

FORD & HARRISON, LLP
502 Washington Avenue, Suite 400
Baltimore, MD 21204
Telephone: (410) 321-7310
Fax: (410) 821-7918