# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

LAUREN SEARLS                    :

                                  :

                                  :

        v.                     :       Civil No. CCB-14-2983

                                  :

                                  :

JOHNS HOPKINS HOSPITAL      :

                                  :

## MEMORANDUM

      Lauren Searls brings this action against Johns Hopkins Hospital ("JHH"), claiming that the defendant discriminated against her on the basis of disability in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12112(a) (the "ADA" or "Title I") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). She seeks declaratory and injunctive relief, compensatory damages, attorneys' fees and costs, and other appropriate equitable and legal relief. The plaintiff has filed a motion to strike defendant's expert designations and a motion for partial summary judgment on the issue of liability under the ADA and Section 504, leaving the issue of damages to be resolved at trial. The defendant has filed a cross-motion for summary judgment on all of the plaintiff's claims. For the reasons stated below, the court will grant the plaintiff's motion to strike, grant the plaintiff's motion for partial summary judgment, and deny the defendant's cross-motion for summary judgment.

## BACKGROUND

      Searls is a deaf 2012 graduate of the Johns Hopkins School of Nursing. (Decl. of Lauren O. Searls ¶¶ 2-3, Pl.'s Mot. Summ. J. Ex. 2, ECF No. 39-4.) She can read lips but understands better through American Sign Language ("ASL"). (*Id.* at ¶ 2.) When communicating with

hearing individuals, she voices for herself. (*Id.*; Pl.'s Dep. of Robert Q. Pollard, Jr. 47, Pl.'s Mot.

Summ. J. Ex. 3, ECF No. 39-5.) As a nursing student, Searls completed two clinical rotations in

the Halsted 8 unit at JHH. (Searls Decl. ¶ 5.) During her clinical placements at JHH, the School

of Nursing provided a full-time ASL interpreter. (*Id.*) At the end of her final rotation, she

received a faculty summary of her clinical performance. (Faculty Summary of Clinical

Performance, Pl.'s Mot. Summ J. Ex. 2-A.) In the summary, the faculty member wrote that

Searls "[w]orked well with others on the team and communicated appropriately and with

empathy with the patients and their families." (*Id.*) Under "overall performance," the faculty

member wrote:

> Lauren provided quality nursing care in a… very professional, caring and skilled manner.
> She has shown a strong work ethic and very positive attitude that helped to create a very
> positive work environment. She has performed as an entry-level graduate nurse on Johns
> Hopkins Hospital Halstead [sic] 8 unit. Lauren Searls has met all of the course objectives
> at the expected and frequently at a higher level.

(*Id.*)

On July 13, 2012, a few days before Searls' graduation from the School of Nursing,

Nurse Manager Stacey Rotman sent Searls an email giving her advance notice that she would be

posting two openings for Nurse Clinician I positions in Halsted 8 and encouraging Searls to

apply. (Searls Decl. ¶ 8; Rotman July 13, 2012 Email, Pl.'s Mot. Summ J. Ex. 2-B.) Rotman later

sent her an e-mail with the two job postings. (Searls Decl. ¶ 8; Rotman July 20, 2012 Email, Pl.'s

Mot. Summ. J. Ex. 2-C.)

JHH's job description of the Nurse Clinician I position states that a nurse is responsible

for coordinating care, providing evidence-based patient care, working collaboratively, supporting

safety standards, and using resources in a cost-effective manner. (Job Description, Def.'s Mot.

Summ. J. Ex. 2 at 5, ECF No. 42-3.) A requisite skill is "[h]ighly effective verbal communication

and interpersonal skills to establish working relationships." (*Id.*) Communication is listed as an "essential job function," and a nurse is required to "liste[n] actively to opinions, ideas and feelings expressed by others and respon[d] in a courteous and tactful manner." (*Id.* at 10.) Another essential job function is "communcat[ing] unresolved issues to appropriate personnel." (*Id.* at 9.) Nurses must also be competent in "[g]eneral physiologic monitoring and patient care equipment such as defibrillator and glucometer monitor." (*Id.* at 5.)

Searls applied for the Nurse Clinician I position, and JHH offered her an interview. (Searls Decl. ¶ 8; Cynthia Ranzolin July 27, 2012 Email, Pl.'s Mot. Summ. J. Ex. 2-D.) She interviewed with Rotman on August 15 and was offered the Nurse Clinician I position on Halsted 8 the next day. (Searls Decl. ¶ 8; Ranzolin July 30, 2012 Email, Pl.'s Mot. Summ. J.  Ex. 2-E; Allie Murphy Aug. 16, 2012 Email, Pl.'s Mot. Summ. J. Ex. 2-F.) Searls accepted the offer that same day. (Searls Decl. ¶ 8; Searls Aug. 16, 2012 E-mail, Pl.'s Mot. Summ. J. Ex. 2-F.) Her offer letter included the provision that "the offer of employment and start date are contingent upon successful completion of... a health screening and clearance by the Office of Occupational Health Services." (Def.'s Rotman Dep. at Ex. 4, Def.'s Mot. Summ. J. Ex. 4, ECF No. 42-5.) The annual salary for the position was $59,508.80. (*Id.*)

After Searls received the offer, she asked Rotman whom to contact to request an ASL interpreter. (Searls Decl. ¶ 9; Rotman Aug. 16, 2012 Email, Pl.'s Mot. Summ. J. Ex. 2-G.) Rotman told her to notify the Department of Occupational Health during her pre-employment screening. (Searls Decl. ¶ 9; Rotman Aug. 21, 2012 Email, Pl.'s Mot. Summ. J. Ex. 2-G.) Searls told a staff member from the Department of Occupational Health that she would require full-time ASL interpretation as an accommodation. (Searls Decl. ¶ 9.) The staff member told Searls that

Rhodora Osborn, JHH's ADA Compliance Specialist, would be in touch with her to discuss the request. (*Id.*) Mary Henderson from the Department of Occupational Health sent Osborn an email informing her that Searls "has a hearing deficit since age 2 and has bilateral hearing aids" and that she was "requesting a sign language interpreter." (Dep. of Rhodora Osborn 37, Pl.'s Mot Summ J. Ex. 7, ECF No. 39-9; Henderson Aug. 27, 2012 Email, Pl.'s Mot. Summ. J. Ex. 10, ECF No. 39-12.) Osborn then notified Kate Demers, the ADA/Accessibility Consultant at JHH at the time, and spoke with Henderson about Searls' request for an interpreter. (Dep. of Kate Weeks 11, Pl.'s Mot. Summ. J. Ex. 9, ECF No. 39-11; Osborn Dep. 37; Osborn Aug. 28, 2012 Email, Pl.'s Mot. Summ. J. Ex. 10.)

Demers investigated the cost of providing one or two interpreters and determined that the average annual salary of an ASL interpreter proficient in medical terminology would be between $40,000 and $60,000 and concluded that Searls would require a team of two interpreters with her at all times at an annual cost of $240,000. (Weeks Dep. 32; Demers Sept. 11, 2012 Email, Pl.'s Mot. Summ. J. Ex. 12, ECF No. 39-14.) In 2012, Halsted 8 had an operational budget of $3.4 million. (Def.'s Supp. Answer to Interrog. No. 5, Pl.'s Mot. Summ. J. Ex. 5, ECF No. 39-7.) Halsted 8 was a part of JHH's Department of Medicine, which had an operational budget of $88 million in 2012. (*Id.*) JHH had an overall operational budget of $1.7 billion in 2012. (*Id.*)

On September 12, Demers sent Rotman an email with the estimate of the cost of an interpreter. (Demers Sept. 12, 2012 Email, Pl.'s Mot Summ. J. Ex. 13 at Def. 0070-0071, ECF No. 39-15.) Rotman forwarded this email to Karen Davis, the director of Medical and Radiology Nursing, commenting, "I know that we can't afford this." (Rotman Sept. 12, 2012 Email, Pl.'s Mot. Summ. J. Ex. 1 at Def. 0005, ECF No. 39-3.) She also wrote, "They are expecting the

department to pay for this. Why isn't the hospital responsible?" (*Id.*) Davis forwarded the emails

to her supervisor, Vice President of Nursing Karen Haller, to ask for her thoughts. (Davis Sept.

12, 2012 Email, Pl.'s Mot. Summ. J. Ex. 1 at Def. 0005.) Davis wrote that Searls "is qualified,"

but because of the cost of an interpreter, her "first response to this, given our financial issues, is

to respond that I cannot accommodate this." (*Id.*) Davis also speculated that having an interpreter

could create scheduling issues and that the interpreter might tell Searls the wrong medicine to

use during an emergency situation. (*Id.*) Davis concluded her email by writing that "Stacey

[Rotman] tells me the nurse is bright and would be a good hire other than this hearing issue."

(*Id.*) In response, Haller wrote, "I do not think we can accommodate this." (Haller Sept. 12, 2012

Email, Pl.'s Mot. Summ. J. Ex. 1 at Def. 0005.) Following this exchange, Rotman responded to

Demers' email stating that she had talked to her director "and the department cannot accept the

restrictions." (Rotman Sept. 12, 2012 Email, Pl.'s Mot. Summ. J. Ex. 13 at Def. 0069-0070.)

Demers then asked for Rotman's reasoning, although she noted, "I assume it is cost." (Demers

Sept. 12, 2012 Email, Pl.'s Mot. Summ. J. Ex. 13 at Def. 0069.) She also wrote, "I want to be

sure we have thoroughly investigated all avenues as [Searls] is a qualified applicant, and we are

part of the larger JHH." (*Id.*) Rotman responded, "Yes, the reason is cost." (Rotman Sept. 12,

2012 Email, Pl.'s Mot. Summ. J. Ex. 13 at Def. 0069.)

On September 17, Demers asked Rotman for a "further breakdown" on the reason for

rejecting the accommodation request, explaining her desire to "demonstrate we have shown good

effort." (Demers Sept. 17, 2012 Email, Pl.'s Mot. Summ. J. Ex. 13 at Def. 0068-0069.) She

asked Rotman to "try to include as much information as possible to illustrate hardship on the

organization." (*Id.*) The next day, Demers asked Rotman to "determine what your department's

threshold would be for interpreting costs," explaining that "[i]t would be helpful to know what your department would be able to spend so we can see if a compromise would be a solution." (Demers Sept. 18, 2012 Email, Pl.'s Mot. Summ. J. Ex. 13 at Def. 0068.)

Davis, who was also on the email chain, responded to Demers that while she would like to accommodate Searls, "this will not be possible." (Davis Sept. 18, 2012 Email, Pl.'s Mot. Summ. J. Ex. 13 at Def. 0068.) She wrote, "There are no other funds to pull from within our department. The interpreters would be an ongoing operating expense that is not budgeted or funded. Thus, our threshold is zero for interpreter costs." (*Id.*) Davis further explained that because the overall budget of the unit was $3.4 million and the overall budget of the department was $88 million, "we would have to lay off 4 nurses to fund this as we cannot incur any new expenses." (*Id.*) She cautioned that laying off nurses "would cause inappropriate nurse patient ratios on this unit and an enormous safety risk." (*Id.*) Davis did not express any of the concerns she had raised in her email to Haller about scheduling and emergency situations, and only raised cost as the reason for not hiring Searls. (*Id.*) During the time Searls' accommodation request was evaluated, no one asked Searls how she would work with an interpreter, including during an emergency situation or when an alarm sounded, or proposed any alternative accommodation. (Searls Decl. ¶ 11-12.)

On September 20, Searls explained to Osborn that she was only seeking one full-time ASL interpreter. (Searls Dec. ¶ 12.) A few days later, Demers sent Rotman an email explaining that with one interpreter, instead of two, the cost of providing the accommodation would decrease to $120,000 per year, but "the undue hardship based on cost would still apply from my understanding." (Demers Sept. 24, 2012 Email, Pl.'s Mot. Summ. J. Ex. 14 at Def. 0223, ECF

No. 39-16.) Demers wrote that "a letter is being drafted for Lauren explaining the undue

hardship based on cost," but asked Rotman to let her know "if there are other reasons we should

add." (*Id.*) Rotman never provided Demers with any reason other than cost for not hiring Searls.

(Pl.'s Rotman Dep. 78, Pl.'s Mot. Summ. J. Ex. 4, ECF No. 39-6.)

Osborn and Rotman rescinded Searls' job offer in a letter dated September 28. (Sept. 28,

2012 Letter from Osborn and Rotman, Pl.'s Mot. Summ. J. Ex. 2-L.) They explained:

> After several interactive consultations with you and other resources as appropriate, we
> regret to inform you that we are unable to provide the interpreter services. We are unable
> to provide the accommodation because of its effect on the resources and operation of the
> department. As a result of the decision, we must rescind the offer of employment.

(*Id.*)

In January 2013, after several months of searching for a new job, Searls began working

as a nurse at the University of Rochester Medical Center's Strong Memorial Hospital ("Strong"),

where she continues to work today. (Searls Decl. ¶¶ 16-17.) After Strong offered her the job,

Searls requested a full-time ASL interpreter. (*Id.* ¶ 17.) Strong agreed, and since January 2013,

Searls has worked with an ASL interpreter. (*Id.* ¶ 16-17; Dep. of Elizabeth Ballard 18-19, Pl.'s

Mot. Summ J. Ex. 15, ECF No. 39-17.) Searls' supervisor at Strong testified that Searls'

deafness and use of an interpreter have never negatively affected patient care, her response to

alarms, or her participation in codes. (Dep. of Elizabeth Conderman 36-37, Pl.'s Mot. Summ. J.

Ex. 16, ECF No. 39-18.) At Strong, Searls has exceeded standards on her performance reviews

and has received promotions. (Sept. 10, 2013 Performance Review, Pl.'s Mot. Summ. J. Ex. 19,

ECF No. 39-21; April 12, 2015 Performance Review, Pl.'s Mot. Summ. J. Ex. 20, ECF No. 39-

22; Conderman Dep. 32-34.)

**ANALYSIS**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 2003)).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). "In considering each motion, [the court must] 'resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392-93 (4th Cir.

8

2014) (quoting *Rossignol*, 316 F.3d at 523).

Searls claims that JHH violated the ADA and Section 504 of the Rehabilitation Act by rescinding her job offer even though she was a qualified individual who, with the accommodation of an ASL interpreter, was fully able to perform the essential job functions of a nurse. The ADA makes it illegal for an employer to "discriminate against a qualified individual on the basis of disability...." 42 U.S.C. § 12112(a). To establish a prima facie case on her failure-to-accommodate claim, Searls must show that (1) she is an individual with a disability within the meaning of the ADA; (2) JHH had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) JHH refused to make such reasonable accommodation. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir.2013). Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. § 794(a). Employment discrimination claims brought under Section 504 are evaluated using the same standards as those "applied under [T]itle I of the Americans with Disabilities Act of 1990." *Id.* § 794(d).

Even if Searls establishes her prima facie failure-to-accommodate case, JHH may avoid liability "if it can show as a matter of law that the proposed accommodation will cause undue hardship in the particular circumstances," *Reyazuddin v. Montgomery Cty., Maryland*, 789 F.3d 407, 414 (4th Cir. 2015) (internal quotation marks and citations omitted), or that Searls constituted a "direct threat," meaning that she posed a significant risk to the health or safety of others that could not be eliminated or reduced to an acceptable level by a reasonable

accommodation. *See Champ v. Balt. Cnty.*, 884 F.Supp. 991, 998 (D.Md.1995).

The parties do not dispute that Searls is deaf and therefore has a disability within the meaning of the ADA and Section 504. JHH had notice of Searls' disability because she had previously worked at the hospital with ASL interpreters during her clinical rotations, and she formally requested an ASL interpreter during her employee health screening. Furthermore, it is undisputed that JHH declined to provide Searls with her requested accommodation of a full-time ASL interpreter and rescinded her job offer as a result. Thus, whether Searls can make out a prima facie case of disability discrimination depends on whether an ASL interpreter was a reasonable accommodation, which in turn depends on whether hiring an ASL interpreter to work with Searls would have reallocated essential job functions.

## I.        Reasonable Accommodation

The parties dispute whether Searls' request for a full-time accommodation was reasonable. To defeat an employer's motion for summary judgment, a plaintiff must "present evidence from which a jury may infer that the [proposed] accommodation is reasonable on its face, i.e., ordinarily or in the run of cases. A reasonable accommodation is one that is feasible or plausible." *Reyazuddin*, 789 F.3d at 414 (internal quotation marks and citations omitted). The reasonableness of an accommodation depends on whether it "enables the employee to perform the essential functions of the job in question." *Myers v. Hose,* 50 F.3d 278, 283 (4th Cir. 1995). Essential job functions are "functions that bear more than a marginal relationship to the job at issue." *See Tyndall v. Nat'l Educ. Ctrs. of Cal.,* 31 F.3d 209, 213 (4th Cir.1994).

In defining "reasonable accommodation," Congress expressly included "the provision of qualified readers or interpreters" as an illustration. 42 U.S.C. § 12111(9)(B). The Second Circuit

recently explained that although an ASL interpreter may not always be a reasonable

accommodation, interpreters are a well-recognized accommodation:

> First, the term "reasonable accommodation" is defined by regulation to include "the
> provision of qualified readers or interpreters." 29 C.F.R. § 1630.2(o)(2)(ii). Per se rules
> are unreliable in the disability context, so ASL interpretive services may not *always*
> constitute a reasonable accommodation. But according to the regulations, interpreters are
> a common form of reasonable accommodation. *See* 29 C.F.R. § 1630 app. ("Part 1630
> lists the examples, specified in title I of the ADA, of the most common types of
> accommodation that an employer or other covered entity may be required to provide.").

*Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 96 (2d Cir. 2015). Searls further supports the

reasonableness of her accommodation request through evidence from her experts, her current

experience as a nurse at Strong where she works with an ASL interpreter and has received

positive performance reviews, and her clinical rotation at Halsted 8 during which she was

provided an ASL interpreter and received a positive review. Notably, Rotman offered Searls the

nursing position at Halsted 8 because she thought she would be a strong addition to the unit,

based in part on her colleagues' opinion that Searls was able to perform her nursing duties during

her Halsted 8 clinical rotation in which she worked with an ASL interpreter. (Def.'s Rotman

Dep. 27, 37.) Given that Congress included an "interpreter" as an illustrative example of a

"reasonable accommodation," employers commonly provide interpreters as a reasonable

accommodation, and Searls has worked effectively with interpreters at Halsted 8 and in her

current nursing job, Searls' proposed accommodation was reasonable unless, as JHH argues,

hiring a full-time ASL interpreter would have reallocated essential job functions.

"[A] reasonable accommodation 'does not require an employer to reallocate essential job

functions or assign an employee 'permanent light duty.'" *Griffin v. Holder*, 972 F. Supp. 2d 827,

848 (D.S.C. 2013) (quoting *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 Fed.Appx. 314,

323 (4th Cir.2011) (holding that reducing a school counselor's caseload was not a reasonable accommodation because it would shift her duties to other counselors and increase their workload)). "The ADA simply does not require an employer to hire an additional person to perform an essential function of a disabled employee's position." *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 687 (4th Cir. 1997) (concluding that a salesperson who experienced epileptic seizures was unable to perform the essential security function of his job, and no reasonable accommodation was possible because the plaintiff was sometimes solely responsible for the security of the store, and when he had a seizure, he was unable to provide security). The Equal Employment Opportunity Commission's regulations explain that:

> An employer or other covered entity is not required to reallocate essential functions. The essential functions are by definition those that the individual who holds the job would have to perform, with or without reasonable accommodation, in order to be considered qualified for the position. For example, suppose a security guard position requires the individual who holds the job to inspect identification cards. An employer would not have to provide an individual who is legally blind with an assistant to look at the identification cards for the legally blind employee. In this situation the assistant would be performing the job for the individual with a disability rather than assisting the individual to perform the job. *See Coleman v. Darden*, 595 F.2d 533 (10th Cir. 1979).

29 C.F.R. § 1630 app.

In determining which job functions are essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description... for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). The two essential job functions included in the JHH Nurse Clinician I job description that are relevant to this case are (1) communicating with patients, family members, and other hospital personnel, and (2) monitoring and responding to

alarms.[1] The parties agree that Searls could not have performed these essential functions without an accommodation, but they disagree whether providing an ASL interpreter would have reallocated these duties.

Searls' case is distinguishable from other cases where providing the requested accommodation amounted to reallocating essential job functions. In those cases, the accommodation request was found unreasonable because the employee requested that another employee perform the entirety of an essential job function, leaving the employee with no portion of the essential job function to perform. *See*, *e.g.*, *E.E.O.C. v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 595 (4th Cir. 2015)[2] (finding that where an essential job function was lifting more than 20 pounds, requiring other employees to perform the heavy lifting function was not reasonable); *Stephenson v. Pfizer Inc.*, 49 F. Supp. 3d 434, 442 (M.D.N.C. 2014) (holding that the employer was not required to provide a driver or transportation as an accommodation for a legally blind pharmaceutical sales representative to perform the essential job function of driving); *Martinson*, 104 F.3d at 687 (determining that the employer had no duty to hire an additional person to perform the essential security function for a salesperson who experienced seizures). In contrast, even with the assistance of an ASL interpreter, Searls would perform a significant portion of the essential job functions of communicating and responding to alarms herself: Searls would decide which questions to ask, she would voice for herself in speaking to patients and other professionals, and she would act in response to alarms. An interpreter, lacking the requisite medical training, could not act independently of Searls to communicate about patient care and respond to alarms.

---

[1] The plaintiff's experts also testified that essential functions of a registered nurse in an acute care hospital are the ability to communicate and the ability to respond to alarms. (Dep. of Michael McKee 24-25, Def.'s Mot. Summ. J. Ex. 3, ECF No. 42-4; Def.'s Pollard Dep. 25-26, Def.'s Mot. Summ. J. Ex 2, ECF No.42-3.)

[2] Unpublished cases are cited not as precedent but for the relevance and persuasiveness of their reasoning.

Therefore, because it is clear that Searls would retain responsibility for a substantial portion of the duties of communicating and responding to alarms if she were provided an ASL interpreter, the question becomes whether her inability to hear affected her ability to communicate and respond to alarms such that she would be "unable to 'perform' [these] essential function[s] within the meaning of the ADA. When the question is thus a matter of degree… a plaintiff fails to perform the essential function only if her failure detrimentally affects the purpose of the employment." *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 279-80 (4th Cir. 2004) (finding that an actress's problems interacting with others, due to posttraumatic stress disorder and depression, did not rise to a level that made her unable to perform the alleged essential job function of interacting with others where she missed only half of one performance due to her impairment, and her difficulties were mainly in offstage interactions); *cf. Tyndall*, 31 F.3d at 213 (holding that a teacher failed to perform the essential function of attendance because her absences made her unable to fulfill her teaching obligations). As noted, with the aid of an interpreter, Searls could perform a substantial portion of the essential job functions of communicating and responding to alarms – most importantly, those portions requiring nursing judgment – so that her inability to hear did not detrimentally affect the purpose of employing her as a nurse. A nurse's duties with respect to communicating and responding to alarms go beyond hearing what patients are saying and hearing an alarm ringing. Searls would have used her own medical expertise and training when speaking to patients, families, and other hospital personnel; providing care based on her exchanges with patients; and taking the appropriate action in response to an alarm after an interpreter communicated the sound of an alarm visually. Therefore, Searls' accommodation request would not have reallocated the essential job functions

of communicating with others and responding to alarms. Searls' request for a full-time ASL interpreter was reasonable, and Searls has established a prima facie case of disability discrimination.

## II.    Undue Hardship Defense

JHH argues that providing Searls with an interpreter would have caused an undue hardship on the hospital's operations. An employer is not liable if it "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A). Title I of the ADA defines "undue hardship" as "an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)." *Id.* § 12111(10)(A). Subparagraph (B), in turn, provides a non-exhaustive list of relevant factors to be considered:

> (i) the nature and cost of the accommodation needed under this chapter; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and  (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

*Id.* § 12111(10)(B). To demonstrate undue hardship, the employer "must show special (typically case-specific) circumstances." *Reyazuddin*, 789 F.3d at 414 (citing *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401-02 (2002)).

JHH's overall budget, the Department of Medicine's operational budget, and Halsted 8's operational budget are all relevant factors. *See* 42 U.S.C. § 12111(10)(B)(ii)-(iii); *see also Reyazuddin*, 789 F.3d at 418 (finding that the county's overall budget and the unit's operating

budget were relevant factors). Despite the relevance of JHH's overall budget, JHH's motion for

summary judgment focuses exclusively on the resources and operations of Halsted 8 and the

Department of Medicine and ignores the question of how providing an interpreter costing at most

$120,000, or 0.007% of JHH's 2012 operational budget of $1.7 billion, could impose an undue

hardship on the hospital.[3]

JHH essentially argues that it had no money in its budget for reasonable

accommodations. The employer's budget for reasonable accommodations is "an irrelevant factor

in assessing undue hardship" because "[a]llowing [an employer] to prevail on its undue hardship

defense based on its own budgeting decisions would effectively cede the legal determination on

this issue to the employer that allegedly failed to accommodate an employee with a disability.

Taken to its logical extreme, the employer could budget $0 for reasonable accommodations and

thereby always avoid liability." *Reyazuddin*, 789 F.3d at 418. In its motion for summary

judgment, JHH maintains that "[n]either of the operating budgets of the Halsted 8 unit nor the

Department of Medicine, in which Halsted 8 was then located, had the budgeted resources to

absorb the additional $120,000 cost." (Def.'s Mot. Summ. J. 15.) JHH then claims that because a

nurse's starting salary is about $60,000, and a full-time ASL interpreter would cost $120,000,

"[i]n order to fund the $120,000 annual cost, the nursing unit would have needed to lay-off at

least two full-time Registered Nurses." (*Id.*) The nursing unit would only have to discharge two

nurses, however, and thereby reallocate the nurses' combined salaries totaling $120,000, if it had

budgeted $0 for reasonable accommodations. JHH's position in its motion for summary

judgment is consistent with the statement from Davis, the director of Medical and Radiology

---

[3] It is not clear that a full-time interpreter would cost $120,000. JHH previously estimated that the average salary for a full-time medical interpreter was between $40,000 and $60,000. At the motions hearing held on December 15, 2015, JHH could not explain why, given the salary estimates previously provided, one full-time ASL interpreter would cost $120,000.

Nursing, that the department's "threshold is zero for interpreter costs." (Davis Sept. 18, 2012 Email.)

Additionally, even if it is correct that the salary of a full-time ASL interpreter would be twice the salary of a nurse, that in itself does not establish that an ASL interpreter would be an undue hardship. The EEOC's interpretive guidance on its Title I ADA regulations explains that "[s]imply comparing the cost of the accommodation to the salary of the individual with a disability in need of the accommodation will not suffice." 29 C.F.R. § 1630 app.  Furthermore, it is "particularly relevant" that Strong has been able to accommodate deaf nurses. *See Reyazuddin*, 789 F.3d at 418 (citing *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1272 (D.C.Cir.2008) (affirming the entry of a declaratory judgment on Section 504 liability in part by reasoning that "because other currency systems accommodate the needs of the visually impaired, the Secretary's burden in demonstrating that implementing an accommodation would be unduly burdensome is particularly heavy")). Because Strong has been able to provide Searls with an ASL interpreter, and because JHH seeks to prevail on its undue hardship defense based on its decision to budget $0 for reasonable accommodations, while failing to account for its $1.7 billion budget, JHH has not met its burden of establishing undue hardship. The plaintiff's motion for summary judgment on this defense will be granted.

### III.    Direct Threat Defense

JHH also argues that employing Searls as a nurse would have imposed a direct threat. The ADA defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). An "employer must determine whether a reasonable accommodation would either eliminate the risk or reduce it to an

acceptable level." *Champ*, 884 F.Supp. at 998 (citing 29 C.F.R. § 1630 app.). In its motion for summary judgment, JHH notes that some alarms were only auditory and argues that "[i]t would have been a significant patient safety risk to rely on an interpreter, without any nursing training, to engage in nursing judgment by determining which alarm was sounding and to rely on the interpreter's judgment to determine when a patient emergency was occurring, requiring nursing assistance." (Def.'s Mot. Summ. J. 23.)

JHH's direct threat defense is based on post-hoc rationalizations and is therefore suggestive of pretext. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext[.]"). The only statement JHH uses to support its direct threat defense that was made contemporaneously with its decision to rescind Searls' offer of employment was Rotman's September 23 email that noted Searls would need an interpreter during all work hours because "[s]he will have unexpected phone calls, call bells ringing, critical patient situations, etc." (Rotman Sept. 23, 2012 Email, Pl.'s Mot. Summ. J. Ex. 14 at Def. 0223.) Nowhere in the email did Rotman state that Searls could not manage unexpected phone calls, call bells, or critical patient situations with the aid of an interpreter. All other contemporaneous evidence indicates that JHH rescinded the job offer because of the cost of providing a full-time ASL interpreter. Notably, Rotman explained that "the reason is cost" for not providing the accommodation. (Rotman Sept. 12, 2012 Email.) Additionally, when Demers wrote to Rotman to inform her that she was drafting a letter to Searls explaining "the undue hardship based on cost," she asked "if there are other reasons we should add please let us know," (Demers Sept. 24, 2012 Email), but Rotman never provided Demers any other reasons for denying the accommodation.

(Pl.'s Rotman Dep. 78.) Because JHH did not raise patient safety concerns until after Searls brought the lawsuit, because the issue of patient safety is absent from contemporaneous communications concerning the reason for denying Searls an ASL interpreter, and because the only explanation JHH gave to Searls for revoking her job offer was the cost of providing a full-time interpreter, JHH has not met its burden on its direct threat defense. *See Jacobs*, 780 F.3d at 575 ("an employer's provision of shifting and inconsistent justifications for taking an adverse employment action 'is, in and of itself, probative of pretext'" (quoting *EEOC v. Sears Roebuck & Co.,* 243 F.3d 846, 852–53 (4th Cir.2001))).

JHH's direct threat defense also fails because the record shows that JHH failed to base its determination "on an individualized assessment of [Searls'] present ability to safely perform the essential functions of [her] job." 29 C.F.R. § 1630.2(r); *see also Champ,* 884 F.Supp. at 998 ("The decision that an individual creates a direct threat... must depend on an individualized assessment of the safety risks the disabled individual actually poses." (citing *Sch. Bd. of Nassau Cnty. v. Arline,* 480 U.S. 273, 287(1987))). Such an assessment must "be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence" and must consider factors such as: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." 29 C.F.R. § 1630.2(r). No such individualized assessment occurred here. Instead, JHH relied on stereotypes or generalizations about deafness. Aside from Rotman's September 23 email previously discussed, the only other evidence JHH presents to support its direct threat defense is Rotman's deposition where she testified that she was concerned about Searls' "ability to function safely as a nurse on Halsted 8" based on

whether "she would be able to hear the alarms." (Def.'s Rotman Dep. 37-38.) Rotman admitted

that she had never observed Searls fail to respond to an alarm. (*Id.* at 38.) She also said that it

"wouldn't be a safe situation" for a non-nurse to be trained to differentiate between the alarms.

(*Id.* at 56.) Rotman never expressed this concern to Searls. (*Id.* at 38.) In fact, the defendant does

not dispute that no JHH employee ever raised patient safety concerns with Searls or asked how

she planned to work with an interpreter to respond to alarms. (*See* Searls Decl. ¶¶ 10-14.)

Rotman speculated that because Searls is deaf and cannot hear alarms she would endanger

patient health, but she "fail[ed] to provide any medical basis for [her] conclusion, and [she] does

not discuss whether the safety concerns could be alleviated by reasonable accommodation." *See*

*Taylor v. Hampton Roads Reg'l Jail Auth.*, 550 F.Supp.2d 614, 620 (E.D.Va.2008). Therefore,

JHH has not met its burden of establishing that Searls constituted a "direct threat" to the safety of

others at Halsted 8. The court will grant the plaintiff's motion for partial summary judgment on

the issue of direct threat.

### IV.    Motion to Strike Defense Experts

Searls has filed a motion to strike defense experts Maria Cvach, Clyde C. Richard, and

Garry Brock. (Mot. Strike, ECF No. 38.) Searls argues that because all three experts lack any

expertise in the area of deafness, the work of deaf healthcare professionals, or the ability of deaf

nurses to function in nursing units, they should not be permitted to testify. JHH counters that

these experts will testify only "on the issue of whether Ms. Searls could monitor and respond to

the multiplicity of alarms on Halsted 8 with or without a full-time ASL interpreter." (Def.'s

Opp'n Mot. Strike 6, ECF No. 40.)

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or
education may testify in the form of an opinion or otherwise if: (a) the expert's scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. Under *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993), expert testimony must be "reliable" and "relevant," and this determination "depend[s] upon the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260-61 (4th Cir.1999) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).

Because all three experts lack experience with deaf healthcare professionals or deafness in general, they cannot reliably testify about how Searls would have worked with an interpreter to monitor and respond to alarms, and whether she could safely monitor and respond to alarms on Halsted 8 with an interpreter. Additionally, because the court finds that JHH's direct threat defense relies on post-hoc rationalizations without any individualized assessment, the proposed expert testimony about whether a deaf nurse can safely monitor and respond to alarms with the assistance of an interpreter is not relevant. Therefore, the court will grant the plaintiff's motion to strike.

## CONCLUSION

For the reasons stated above, the plaintiff's motion for partial summary judgment and the plaintiff's motion to strike will be granted, and the defendant's cross-motion for summary judgment will be denied.

A separate order follows.

January 21, 2016                                    _____/S/_____
Date                                                        Catherine C. Blake
                                                                United States District Judge